No. 29,481.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, *Plaintiff*, v. THE HIGHWAY COMMISSION OF THE STATE OF KANSAS, *Defendant*.

(295 Pac. 986.)

 opinion filed February 7, 1931.

*Robert O. Mason,* assistant attorney-general, *James L. Galle,* county attorney, and *Thomas Amory Lee,* of Topeka, for the plaintiff.

*John A. Hall* and *Ralph M. Hope,* attorneys for the state highway commission, for the defendant.

*H. S. Rogers,* county attorney of Pawnee county, as *amicus curiæ.*

The opinion of the court was delivered by

DAWSON, J.: This is an original proceeding in mandamus in which the state's department of justice and its highway commission invoke the aid of this court to unravel certain financial snarls which have arisen out of the transfer to the state highway commission of certain responsibilities which heretofore rested on county boards and local officials relating to the construction of the state highway system.

On April 1, 1929, chapter 225 of the session laws of that year took effect. By its terms it became the duty of the several boards of county commissioners then and theretofore engaged in constructing roads and bridges included in the state highway system to surrender to the authorized representatives of the state highway commission all machinery, equipment and road materials which had been purchased with moneys of the several county and state road funds. It was also provided that—

". . . On April 1, 1929, the state highway commission shall assume the rights and liabilities of the various counties on all existing contracts for the construction, improvement, reconstruction or maintenance of state highways and bridges and for the purchase of machinery, equipment or material for use on state highways." (Sec. 19.)

The statute also provided that there should be redelivered over to the state treasurer and credited to the state highway fund all un-

expended balances of certain funds in the several county treasuries, and that outstanding warrants issued by any county for the construction of roads included in the state highway system, and certain benefit-district costs, should be paid by the state highway commission. (Sec. 17.)

At the time this act took effect and for a considerable period prior thereto the several counties of the state were engaged in the construction, improvement and reconstruction of roads and bridges, some of which were included in the state highway system and others which were merely county or township roads. The funds for use on these different roads, or roads and bridges, were not always handled with uniformity and precision as to methods of bookkeeping. It was not uncommon for county boards to draw on one road fund to pay warrants properly chargeable on another road fund; and in some instances warrants chargeable to the county and state road fund were paid out of general balances of miscellaneous county funds if the county and state road fund happened to be temporarily exhausted. The abundant stream of revenues which was constantly flowing to the counties from the proceeds of automobile licenses and gasoline sales taxes made the matter of temporary overdrafts in any particular fund seem to be of trivial consequence, as the road fund overdrawn to-day would have a plethora of money to-morrow. In some counties the county board would occasionally make an "order" directing the county treasurer to make temporary transfers of money from one road fund to another to meet obligations on the latter. Such practices were general. It was done with the knowledge and countenance, if not actual encouragement, of the state highway commission itself. Statutory restraints were disregarded for what was conceived to be the object of paramount importance— the early completion of the state highway system "to lift Kansas out of the mud." Probably all such practices were in violation of law. This court cannot approve of them. But our present concern is to state the situation which actually existed in many counties when chapter 225 of the Session Laws of 1929 took effect. The new statute provided that the counties should transmit certain state-road moneys in the county treasuries to the state treasurer for disbursement by the state highway commission. Of more immediate concern, however, was the predicament of counties which had temporarily overdrawn their various local road and bridge funds or

miscellaneous county funds to pay warrants properly chargeable to expenditure for roads included in the state highway system. The new statute put an end to the flow of money to the counties which would have reimbursed the funds temporarily overdrawn in the prosecution of the state highway projects.

Confronted with this situation, the state highway commission undertook to make adjustments with the various counties, and within a year had made settlements with over half the counties. Instances of peculiar complexity arose, however, where the methods of bookkeeping in vogue in certain counties were so intricate or unusual that the commission would not assume responsibility for making settlement without judicial determination of the matters in controversy between itself and the county authorities. One of the counties where the effect of the new statute was to throw into chaos its financial accounts was McPherson county. Owing to its zeal in prosecuting the work of state road building the McPherson county board had drawn on local road funds and other county funds to pay warrants for work done on the state road system. The county board also caused to be transferred moneys from other funds to the county and state road fund, in reliance on its own power to return the "borrowed" or overdrawn money upon receipt of remittances from the gasoline sales taxes as such remittances had been accustomed to arrive in conformity with existing statutes. When the new act took effect, and those remittances ceased to arrive, the accounts of the county could not be put to rights without the cooperation of the state highway commission.

The state on the relation of the attorney-general seeks to disentangle this mess by mandamus, on the theory that the state highway commission is the legal successor of the board of county commissioners to whatever extent the highway commission has taken over the powers and duties of the county in road building and matters pertaining thereto, and in consequence it becomes the duty of the highway commission to make the proper adjustments with McPherson county to reimburse its various local funds for moneys paid for warrants issued for building state roads in that county, and which the highway commission under the new statute would have been bound to pay if McPherson county had not taken them up with other funds.

The action is formulated in five counts:

Count 1 relates to a situation growing out of the act of 1925

(ch. 274) which took effect on May 1 of that year, which provided for a sales tax of 2 cents per gallon on motor-vehicle fuel (gasoline) and that a certain portion of the revenues collected therefrom should be distributed to the several counties on the first day of each month and placed in the general road fund and expended as provided by law. (Sec. 10.) This statute was in full force and effect for two months. Then it was partly superseded and modified by chapter 214 of the Laws of 1925, effective July 1, 1925. By its terms the county's share of the motor-fuel tax was to be credited to a fund designated as the county and state road fund. On August 8 and 13, 1925, McPherson county received from the state auditor remittances aggregating $6,723.07 as its share of the motor-fuel tax collections for the months of May and June, but instead of placing that money to the credit of the general road fund as required by the earlier statute (ch. 274), in effect when such gasoline tax money was collected, the county treasurer erroneously placed it in the county and state road fund created by the later statute, and of that sum $4,804.80 was expended on roads of the state highway system. The cessation of remittances for expenditures on roads of the state highway system occasioned by the act of 1929 prevents the board of county commissioners of McPherson county from restoring this sum to its general road fund without the coöperation of the state highway commission which has funds which properly should be used to reimburse the county road fund.

Count 2 alleged certain facts concerning the use of county bridge funds expended on the state highway system, but that cause of action has been abandoned.

Count 3 relates to a sum of $8,000 which the county board ordered the county treasurer to transfer temporarily from the so-called county drag fund to the county and state road fund to replenish it so that warrants for construction of roads of the state highway system in McPherson county could be promptly paid without waiting further remittances from the state. The intrusion of the act effective April 1, 1929, has left the so-called county drag fund erroneously depleted to the extent of $8,000 and reimbursement therefor is sought in this court.

Count 4 grows out of certain discrepancies between the actual amount expended on state roads in McPherson county and the aggregate amount credited to the county and state road fund therefor. Under the supervision and approval of the state highway commission

McPherson county expended on the state road system the sum of $311,606.56, exclusive of transfers to federal aid projects not here pertinent. But of these authorized expenditures on state roads, the county treasurer, apparently for want of sufficiently accurate vouchers approved by the county engineer, only charged $306,525.71 to state road work, while the difference, $6,072.95, was paid out of the county's general balances. The state highway commission is asked to adjust this matter by reimbursing the county for this sum.

Count 5 relates to other disbursements, aggregating $27,847.48, on account of state road construction paid out of the county's general cash balances in anticipation of prompt reimbursement by remittances from collections of motor-fuel taxes which did not arrive because of the transfer of all fiscal and related matters pertaining to state road construction from the county board to the state highway commission by the act of April 1, 1929.

The foregoing is a much-abridged summary of the several causes of action.

The state highway commission filed an answer to the alternative writ which contained a general denial, raised questions of law, and concluded with a motion to quash. This was followed by an application by the state for the appointment of a commissioner, on the representation that the litigants could not agree upon the facts necessarily involved, and that the issues of fact raised by the pleadings would necessitate a thorough examination of the county records of McPherson county and of certain records of the state auditor and of the state highway commission.

Accordingly the court ordered that Donald W. Stewart, Esquire, of Independence, be appointed commissioner with the usual powers. He promptly qualified and held extended hearings in McPherson and Topeka. Counsel for the litigants attended, and witnesses and official records and documents were examined at great length. Issues of fact and of law were argued before the commissioner, and the parties were invited to submit suggested findings of fact. This they declined to do. The commissioner discharged that onerous burden with painstaking detail, and his report with its findings of fact and conclusions of law occupies fifty-two closely printed pages. This report reveals a wide range of inquiry into the pertinent statutory law and deals in detail with the intricate character of the facts involved in the necessary accounting between McPherson county and the state departments concerned. But it would serve no useful

purpose to reproduce the elaborate tabulations of figures which accompany the commissioner's report. The court has spent much time on them and the parties concerned are already familiar with them. The commissioner's findings and conclusions were generally in favor of the position taken by the state's legal department in behalf of McPherson county and against the position taken by the state highway commission. The commissioner did reject the plaintiff's claim under its second cause of action, and also rejected items aggregating $8,792.02 pertaining to matters which will be noted below.

The commissioner's general finding and conclusion reads:

"That a writ should issue as prayed in plaintiff's original and supplemental application, directing the defendant to approve for payment a claim in the aggregate sum of *$37,654.56,* when such claim is presented by McPherson county, Kansas, in accordance with the instructions of the state highway commission as set out in exhibit 42, and on the standard form referred to therein.

"It is my further recommendation that the costs of this action be assessed against the defendant, the state highway commission, for the reason that I find the issues generally in favor of the plaintiff and against the defendant, and for the further reason that, as stated before in finding of fact 19, this action should have been submitted to the court as an action in law, on an agreed statement of facts, and I believe the defendant to have been the more responsible of the two parties for the fact that it was not so submitted, resulting in the creation of the greater portion of the costs referred to."

Plaintiff excepts to one finding only, the 99th, and to the corresponding conclusion of law, which in effect reduces the amount due McPherson county in the sum of $8,792.02 below the amount claimed. The state highway commission takes no exceptions to the commissioner's findings of fact, but it does raise many objections to the conclusions of law, and argues many matters, some of which will be noted in detail, while others for want of time and space must be disposed of *en bloc.*

Noting first the state's single exception to the commissioner's findings and conclusions, it is contended that the total amount for which McPherson county is entitled to be reimbursed is $46,446.58 instead of $37,654.56, as recommended by the commissioner. The disparity between these figures arises from two possible interpretations of the statute of 1925. (Ch. 214, § 4.) It authorized but did not require that 20 per cent of the motor-fuel tax money might be spent on county and township roads and bridges "at the option of the county commissioners." The county board of McPherson county

had a substantial amount of money in the county drag fund when the act creating that fund was repealed. The board decided to exercise its option and set apart the authorized 20 per cent under the act of 1925, placing it in the county drag fund, but a considerable part of this money was not then needed for local road purposes and was not thus expended. Items aggregating $8,792.02 were later drawn out of that fund to pay warrants chargeable to state road projects. The commissioner took the view that the statute did not authorize the gasoline tax moneys to be divided into two funds, 80 per cent and 20 per cent, the larger amount to be devoted to state roads and the smaller to local roads and bridges, that the statute merely authorized the expenditure of 20 per cent on local roads and bridges but did not require any part of the money to be so expended; and that the statute neither authorized nor required the creation of a separate fund for possible future use on local roads and bridges. He held, therefore, that the county was not entitled to reimbursement for gasoline tax moneys expended on state roads which the county had merely intended for use on local roads. Plaintiff argues that the segregation of 20 per cent of the motor-fuel tax moneys for use on local roads was an act in conformity with the statutory option conferred upon the county board. It is suggested that the act of 1925 did not contemplate that money should be spent on the local roads until needed, that the matter of when it should be spent would depend upon weather and traffic conditions; and that it was merely the part of prudence that such a fund be available when conditions require its expenditure. However, under the facts here presented, a majority of this court reject the view urged by plaintiff and hold with the commissioner, being somewhat persuaded thereto by the fact that the legislature of 1927 changed the statute on this controverted point so as to make it mandatory instead of optional that a segregation of 20 per cent and 80 per cent be made of the motor-fuel tax moneys received by the county. (Laws 1927, ch. 255, § 7.)

Passing to the objections and exceptions of the state highway commission to the findings and recommendations of the commissioner, this court deems it unnecessary to dwell at length on the point that mandamus was not a proper method of invoking a judicial determination of the matters in controversy. The use of mandamus to secure a speedy adjudication of questions of law for the guidance of state officers and official boards in the discharge

of their duties is common in this state. (R. S. 60-1701, 60-1702.) Our conceptions of the proper use of mandamus to expedite the official business of the state have expanded far beyond the ancient limitations of matters justiciable in mandamus. (*State v. Dolley*, 82 Kan. 533, 108 Pac. 846; Id. 83 Kan. 80, 109 Pac. 992; *State, ex rel., v. Akers*, 92 Kan. 169, 172, 140 Pac. 637; *State, ex rel., v. Howat*, 109 Kan. 376, 393, 198 Pac. 686; *State, ex rel., v. Bone*, 125 Kan. 818, 266 Pac. 85.)

In this case it is demanded, in substance, that the defendant highway commission settle up with McPherson county. It is its official duty to do so. The performance of official duty may be ordered by mandamus. The fact that an accounting has been necessary to such settlement is only an incident to the official duty which the defendant commission has to perform.

Defendant contends that the amounts and items aggregating $37,-654.56 which is found owing to McPherson county do not constitute "outstanding warrants" properly chargeable to the fund in the hands of the state highway commission. Warrants for that aggregate sum were issued for construction work on roads of the state highway system. If those warrants had not been paid when the state highway commission took over the state road construction work on April 1, 1929, it is perfectly clear that the state highway system would have had to pay them. If the contractors and workmen had sold and assigned those warrants to a bank or private money loaner, the state highway commission would be bound to pay them. It should pay them none the less because they were liquidated with miscellaneous funds of McPherson county in contemplation of the receipt of funds raised by taxation for that very purpose and which only awaited distribution to McPherson county when the act of 1929 interrupted the methods of disbursement in vogue when the obligations for state work evidenced by the warrants were created and when the warrants were issued. Unless some such view of the situation is adopted—unless the transfer of authority by the act of 1929 from the county board to the state highway commission to construct state roads out of funds raised by the gasoline taxes collected and to be disbursed under authority of the acts of 1925 and 1927 can be regarded as one of formality rather than of substance, a very serious question of constitutionality in the act of 1929 would immediately come to the fore. The constitution provides:

"No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied." (Art. 11, § 4.)

We choose to regard the transfer of authority for state road building from the county boards of the several counties of the state as one of legislative expediency merely, not as a substantial diversion of moneys raised by taxation from one purpose to another. The money which the state highway commission is asked to reimburse to McPherson county was raised by taxation to pay for state roads constructed in that county; the county temporarily met that outlay from other funds then available while the process of collecting those taxes was going on. There is not now, and indeed there never has been in this lawsuit, any substantial dispute that the sum which the commissioner finds the state highway commission should pay was in fact expended in the construction of roads which are a part of the state highway system in McPherson county. Whatever formalities or statutory regulations may have been infringed by McPherson county officials, or however intricate or unsatisfactory were the bookkeeping methods in vogue in that county, the fact remains that when this action was begun there was a considerable amount of state highway mileage in existence in McPherson county for which the state had not then, and has not yet, paid, notwithstanding state excise taxes on motor fuel were raised with which to pay it.

The argument is made that the amounts and items involved in the aggregate sum found due the county are not "existing contracts" under section 19 of the act of 1929, quoted at the beginning of this opinion. That argument may be admitted. But until the state pays for the mileage of state roads in McPherson county for which the county is "still holding the sack" the provisions of section 19 are not being dealt with in good faith by the highway commission. On this point the operative interpretation of the statute of 1929 by the state highway commission itself cannot be overlooked. The state highway commission has interpreted its powers under the statute to authorize it to make the identical sort of adjustments and settlements which it declines to make in this case. The commissioner's report and the voluminous and elaborate exhibits which comprise the record disclose that it has settled with the counties of Ellis, Greeley, Haskell, Kearny and Meade for the gasoline tax moneys collectible during May and June, 1925, which is the basis of count 1 in this proceeding. It has settled with Has--

kell county on the same basis on which count 3 is predicated. It has settled with Greeley and Finney counties for claims on an identical basis with that upon which count 4 is formulated. On the fifth cause of action, touching the right of the county to reimbursement for overdrafts upon the county and state road fund, it has recognized the validity of such claims and made settlements with 88 counties. The pertinent finding of the commissioner reads:

"95. In the 88 counties in which the state highway commission has made compromise settlements of the county and state road fund the state highway commission had allowed in such settlements overdrafts of the county and state road fund proper in 48 counties (plaintiff's exhibits 33, 34, 35, 36, 38, 39, 40, 41, 44, 45, 46, 47, 48, 49, 50, 51, 53, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 67, 68, 69, 70, 72, 73, 75, 77, 79, 80, 81, 82, 83, 84, 86, 88, 90, 91, 92), overdrafts in project funds in 30 counties (plaintiff's exhibits 33, 35, 37, 41, 44, 45, 51, 53, 54, 55, 58, 61, 62, 66, 68, 69, 70, 73, 74, 75, 76, 77, 78, 79, 80, 81, 85, 86, 89, 90), and overdrafts caused by payment of outstanding warrants in 33 counties (plaintiff's exhibits 34, 36, 37, 39, 40, 46, 48, 50, 52, 53, 54, 55, 56, 59, 60, 61, 62, 66, 67, 70, 71, 73, 74, 75, 77, 78, 79, 80, 82, 86, 87, 89, 92)."

Compared with amounts paid to other counties in adjustments and settlements such as we have before us for present consideration, the amount is not much above the average. Settlements with some counties which can be picked at random from the tabulations before us show adjustments and settlements for sums higher than that involved in this proceeding. We mention this, however, for no other purpose than to develop the point that the sum due Mc-Pherson county, while considerable, is not at all unusual, for this road-building program in every county has run into tremendous figures. Touching the significance which may properly be attached to the operative interpretation of statutes by officials whose duty it is to carry into effect the purposes of such statutes, see *Harrison v. Benefit Society*, 61 Kan. 134, 59 Pac. 266; *Bank v. Reilly*, 97 Kan. 817, 823, 156 Pac. 747; *Songer v. Bank Commissioner*, 114 Kan. 900, 901, 220 Pac. 1060; *Cavlovic v. Baker et al.*, 118 Kan. 412, 415, 416, 234 Pac. 1009.

Counsel for the highway commission criticize the use of the term "overdrafts" to characterize the transactions whereby other funds of the county were used to meet expenditures properly chargeable to the state highway construction (the county and state road fund). But why wrangle about mere terminology? "Overdraft" is a term familiar to bookkeepers and those who keep track of cash accounts —men whose system of keeping accounts consists of nothing but

the stubs of their check books are familiar with overdrafts. As applied to the case at bar the overdrafts were those transactions whereby warrants issued for state road building were paid by loans or advancements from other county funds when the proper fund was temporarily exhausted. Certainly the state highway commission was not misled by the use of the term "overdraft" in the state-wide road-building work going on all over the state. Before it took over the work of road construction on April 1, 1925, it was its duty to supervise and approve state road expenditures. It kept tab on the status of the funds in the several counties available for that purpose and was thoroughly aware of the practice of paying for state road construction by overdrafts on other county funds. In recognition of such state-wide practice of overdrafting and for the purpose of making proper settlements therefor with the various counties, the state highway commission prepared standard forms for use by the counties, and sent them with a letter of instructions directing that where overdrafts on the county and state road funds had been created by paying state road warrants with other funds the county should list the warrants causing such overdrafts as if they were, in fact, still outstanding warrants, so as to make the amount for which the state highway commission was to reimburse the county equal the total of all such warrants. (Commissioner's finding of fact No. 94.)

Counsel for the state highway commission hammer insistently on the point that it was a violation of law for McPherson county officials to pay warrants chargeable to one fund with moneys out of another fund. Counsel also cite penal and correctional provisions of law for dealing with such practices. All that argument is beside the point. The state highway commission's assumption of the duties of the county board and the consequent stoppage of the flow of funds raised by taxation to pay for state road building in McPherson county created a situation which calls for adjustment by the highway commission since it is not prepared to argue that the statute by which it has superseded the county board is subject to any infirmity. If the statute is valid, as this court are ready to concede it is, then the resulting duty to make an adjustment with McPherson county cannot be met by a discursive debate touching statutory restrictions on the issue and payment of warrants. What the state is insisting upon just now is that its road-building projects go forward, not that these be halted while boards of county commissioners provide jails

for themselves and all other public officials who have anticipated their funds for state road building and created overdrafts on other county funds in their zeal to bring the state's new highway system to a speedy completion.

Counsel for defendant construe the findings and conclusions of the commissioner as a recommendation that a general judgment be entered against the state highway commission. This is a misconception of even the liberal use of mandamus permitted by this court. It is not in any ordinary sense that a judgment for a sum of money is sought against the state highway commission. It is rather to give it a proper cue for the performance of its duty—an assurance that what it has done upon its own initiative in its official dealings with eighty-eight other counties may properly be done, and must be done, in its dealings with McPherson county.

Counsel for the commission say that if this court holds that McPherson county is to be reimbursed, we should point out the fund which is to be drawn on for that purpose. From what has been said in this already too lengthy opinion it ought to be clear what fund is available for payment—it is the fund which was collected to pay it, which would have been available to pay it but for the cessation of the flow of funds to McPherson county which had been raised for that purpose by the act of 1929. It is from the same fund which has been drawn upon by the state highway commission to the extent of several hundred thousand dollars in similar adjustments and settlements it has effected with more than four-fifths of the other counties of this state.

The other objections and exceptions to the report of the commissioner have been laboriously considered, but it is needless to prolong discussion. The commissioner's findings and conclusions are approved, and the state highway commission is directed to proceed to an adjustment and settlement with McPherson county in accordance therewith.

It is so ordered.

SMITH, J., not participating.

APPENDIX.

Résumé of Kansas road statutes and decisions, prepared by Commissioner Donald W. Stewart, as part of his report in Case No. 29,481, herein:

"While the decision of this controversy is dependent primarily upon an interpretation of the road laws of the state of Kansas as they existed in 1925 and as they were amended in 1927 and 1929, yet in the background lies the continuous struggle of the people of this state for good roads and the continuous trend of our laws to that end.

"While it is not my purpose to review in detail the earlier road laws of Kansas, it is interesting and helpful at this time to consider the transition of those laws from the earliest days of statehood. The framers of our constitution precluded the participation of the state, from a financial standpoint, in the building of roads, by the provisions of section 8 of article 11, prohibiting the state from being a party to the carrying on of any works of internal improvement. The reasons for this provision are briefly set out in the opinion of our supreme court in the case of the *State, ex rel., v. Knapp,* 99 Kan. 852. Until this provision was amended roads in Kansas were built exclusively at the expense of the counties or lesser districts traversed by such roads.

"Nevertheless, in the first session of the legislature, and by the provisions of chapter 70 of the Laws of 1861, the legislature authorized and provided for forty-two state roads. These roads were to be located by commissioners designated by the legislature, and the law creating them expressly provided that no part of the expense was to be borne by the state.

"For the next twenty years we find each succeeding session of the legislature establishing and changing such designated state roads. The right of the legislature to so designate highways as state highways, and at the same time require the counties traversed by them to pay the expenses, was determined by the supreme court of this state in the case of the *State of Kansas, ex rel., v. The Board of County Commissioners, Shawnee County,* decided in 1882 and reported in the 28th volume of Kansas Reports, at page 431.

"While the roads so located were dignified by the title of state roads, it is interesting to observe that most of the laws creating them limited the cost of such roads to $2.50 per mile, which was to include the compensation and expenses of commissioners. Roads so called to have required nothing more than the placing of stones to mark the highway, at a width of from 60 to 100 feet. If perchance the course so selected for such highway traversed a cultivated field, the portion so traversed was not to be used for highway purposes until the landowner had had a reasonable opportunity to remove his crops.

"From the earliest times landowners have been permitted to maintain gates across public roads through pasture country. These gates may be kept closed during the pasture season from the first of May until the first of October, but the law is careful to require hitching posts on either side to permit the traveler to hitch his horse while opening the gate.

"In these early days the construction and maintenance of highways was vested in a very responsible and busy official, known as the road overseer,

elected by the voters in a general election in road districts in each township. This road overseer had general supervision of the roads and bridges within his district. It was his duty to keep them open and safe for travel.

"The laws provided that in the fulfillment of that duty he might call upon all or any part of the male inhabitants of his district between the ages of twenty-one and forty-five to remove any obstructions to travel. The inhabitants, when so called, were required to report to the road overseer for duty, armed with proper implements.

"It was further provided that if any inhabitants so called for service failed to report for duty armed with proper implements of service or reported and 'spent his time in idleness' such inhabitant should be subject to a fine of $5. (See section 4, chapter 102, Laws of 1870.)

"The road overseer, in addition to his duties with roads and bridges, had other responsibilities of an equally important character. In many counties of the state he was required to place a plowed strip on either side of a public highway, not less than three furrows wide, for the purpose of preventing the spread of prairie fires.

"Likewise under the Laws of 1883, chapter 150, section 1, the road overseer in each district was required, between June 15 and July 15 of each year, to remove all the cockleburs, burdock, sunflowers, thistles and other obnoxious weeds. It is presumed that his effort in this behalf was limited to the highway, or the land immediately adjoining it, but the act of the legislature makes no such limitation, and leaves his entire road district as the scene of such activities. It was not until 1895 that chapter 359 placed such duty upon the owners of land, leaving to the road overseer only the highway itself, railroad rights of way and unoccupied land.

"The same chapter 150 of the Session Laws of 1883 left to the road overseer the responsibility of directing the plowing of public highways for the purpose of scouring plows, and forbade that method of scouring except under his direction.

"In addition to these duties, whose relationship to roads seems apparent, it will be recalled that the road overseer was also designated as the commander in chief of the early Kansas armies provided by law for the eradication of locusts and grasshoppers. On the request of fifteen legal voters the township trustees were required to direct the road overseer to order out all of the able-bodied male inhabitants between the ages of twelve and sixty-five in fighting these pests. It was his responsibility to prescribe the tools that they should take and to outline the method of warfare.

"The terms of the Laws of 1883 gave him the added duty of giving ten days' notice through the press of the dates, places and manner in which this war of extermination would be conducted.

"Roads were built out of the funds provided by tax levies ranging from one to three mills. In certain instances the legislature directed additional roads and provided for special levies for that purpose. Thus by the terms of chapter 413 of the Laws of 1903, a road district was created in Bourbon county and a macadam road directed to be built. For this purpose a levy was authorized which would raise not less than $15,000 nor more than $16,000 in

cach year. By 1903, likewise, the benefit-district plan of building roads began to make its appearance.

"Federal aid on highway construction was a thing as yet unknown. Nevertheless, we find, in chapter 48 of the Laws of 1863, a joint resolution of the legislature in Kansas to the congress of the United States, praying for the construction of a military road from Fort Leavenworth to Fort Scott, in order to care for the vast federal army in southern Kansas dependent upon Fort Leavenworth for supplies.

"In these days bridges in Kansas bore signs limiting the rate of travel to a walk, and toll roads were authorized by special charter granted to macadam and plank road companies. Our legislature wisely exempted from such tolls inhabitants going to or coming from church, schools, funerals or militia musters, and this exemption remained a part of the statutory laws of Kansas until the revision of 1923, although it is very doubtful if for many years anyone had had the opportunity of availing himself of it.

"The legislature of 1903 first recognized the automobile, which brought with it not only the need for good roads, but in later years the principal method of financing the construction of such roads. By the terms of chapter 67 the speed and method of operation of these strange vehicles were prescribed in detail, but no license provided. This chapter is particularly noted for its provision for the speed and operation of political band wagons.

"It was not until chapter 65 of the Laws of 1913 was adopted that automobiles, which were then becoming more common upon the highways of Kansas, were licensed by the state. A license fee of $5 for automobiles and $2 for motorcycles was prescribed, with all of such revenue except a nominal sum for the license plate itself going into the county road fund, to be used on the highways of the state.

"Thus we find the Laws of 1915, as contained in the Revised Statutes, provided for the laying out of highways by the county or township upon petition, and for the meeting of the costs of such road building from a tax levy limited to one mill on the dollar, except where by a vote of the people a levy of as much as three mills was permissible. The road work of the county was under the general supervision of a county engineer.

"The roads of the state had been classified, under the Laws of 1911, chapter 248, as state roads, county roads, mail routes and township roads. State roads were defined to be those laid out by the state of Kansas. County roads were those designated as such by the board of county commissioners. Free delivery routes were known as mail routes, and all other public highways as township roads.

"County and state roads were maintained at the expense of the county, and mail routes and township roads at the expense of the township. A poll tax was provided, amounting to $3 annually, to be expended on the public roads. It was still unlawful, under the terms of section 8803, to use the public highways for the purpose of scouring plows, and the burden of removing cockleburs, burdocks and sunflowers had been shifted from the road overseer to the township trustee by the provisions of 8794.

"By the terms of section 8798 the old sign which had heretofore been on Kansas bridges limiting travel to no faster than a walk had been amended

to permit the driving of an automobile at a rate not exceeding ten miles an hour. By the terms of section 8792 gates were still permitted across portions of the public highway, with the same convenient hitching posts arranged for the traveler.

"By an act of congress of July 11, 1916, the Secretary of Agriculture was authorized to coöperate with the state highway departments of the several states in the construction, reconstruction and improvement of rural post roads, and the sum of seventy-five million dollars was appropriated to be expended in this manner in a five-year period. In order for the several states to participate in this disbursement of federal aid it was required that the legislature assent to the provision of the act, and that the aid be administered through a state highway commission.

"This new feature of road construction necessitated the rewriting of virtually all of the road laws of the state of Kansas, and by the terms of chapters 264, 265, 266 and 267 of the Session Laws of 1917, this was done. By the provisions of chapter 264 there was created the first state highway commission of the state of Kansas, in which the state assented to the requirements of the federal-aid statute, and designated as its highway commission a body of three members, composed of the governor and two of his appointees. This state highway commission was given general supervision over all of the roads and bridges in the state, except township roads on which federal aid had not been granted. All of the roads in the state were classified as either county or township roads.

"Section 26 of this chapter authorized a road-tax levy of not less than ¼ mill nor more than 1½ mills on all the taxable property in the county, with the proviso that the maximum levy could be increased upon a vote of the people. By the provisions of section 42 a township road levy not exceeding 3 mills was authorized. By the provisions of section 3, in every county in the state which had or might thereafter receive federal aid, the state highway commission, with the county engineer, were required to inspect the government-aid roads and certify to the county commissioners the amount of money that would be required to properly maintain those roads, and they were required to levy a special tax for such purposes, which was to be retained by the county treasurer and paid out on orders drawn by the county board against vouchers approved by the state highway commission.

"Chapter 265 of the Laws of 1917 reënacted with some additions and changes the old benefit-district plan, and provided that after the allocation of state and federal aid the balance of the cost of a road so constructed should be apportioned 50 per cent to the county, 25 per cent to the taxable property within the township or townships in which the benefit district was situated, and the remainder to the property within the benefit district.

"By the provisions of chapter 74 of the Laws of 1917 the registration fee for automobiles and motorcycles remained the same, and all of such fee except the nominal cost of the license plate was placed in the motor-vehicle license fund in each county, to be used only for the dragging of county and township roads, with the unexpended balance going to the county road fund for the maintenance of roads other than by dragging.

"The creation of the state highway commission and its supervisory ac-

tivities over the building of highways in Kansas was held by the supreme court not to be in violation of section 8 of article 11 of the constitution, in the case of the *State, ex rel., v. Raub,* decided in January, 1920, and reported in 106 Kan. at page 196. The 1917 session of the legislature further attempted to make a direct appropriation of $5,000 of state funds to aid in road building. Our supreme court in the case of *The State, ex rel., v. Knapp, State Auditor,* 99 Kan. 852, promptly held this act and this state aid in direct violation of section 8 of article 11 of the Kansas constitution, and an unauthorized aid in works of internal improvement.

"The Kansas legislature of 1919 authorized the submission of an amendment to the people, under the title of the 'good road amendment to the state constitution.' This amendment, which was adopted at the general election held on November 2, 1920, for the first time authorized the financial participation by the state in the building of roads within its limits. It provided that the state might aid in the construction of roads and highways after March 1, 1919, but limited the aid to 25 per cent of the cost, and to $10,000 a mile, and to a maximum limitation of 150 miles in any county.

"Following the amendment above referred to, the legislature of 1921, by the terms of chapter 217, undertook to provide for state aid in road building. While the average resident of Kansas counties may have felt that in the task of road construction within the county the county was receiving aid from some distant and strange source, the facts are that the state-aid road fund created by the legislature was raised wholly within the several counties and by the county officers of the counties in which it was expended. The old motor-vehicle registration fund which had been in existence in every county since 1913, and into which had been placed money derived from license fees on automobiles, motor cycles and motor dealers, was divided into two distinct funds. Into one fund, designated as the special road drag fund, was placed the greater portion of the license fee on automobiles, while in the other fund, designated as a state-wide road fund, was placed the sums received by the several counties from the persons within their counties as a license fee on motor cycles and manufacturers and dealers.

"It should be noted, however, that this same session of 1921 materially increased the amounts to be raised under the automobile registration license act, thus augmenting materially the funds formerly available for road construction.

"This special state-aid road fund was, as before stated, collected by county officers within the county and retained by the county treasurer, to be used in the construction of roads under the joint direction of the county commissioners and the state highway commission. In addition to the state aid thus created the earlier provisions of congress affecting federal aid were extended and liberalized. Save, however, for the federal aid, the roads in Kansas were still being constructed out of funds raised wholly within and by the officers of the several counties.

"By the provisions of chapter 175 of the Session Laws of 1923 the several counties were privileged to use in county road work such portion of the state-aid road fund as might have accumulated in excess of the needs for which said state-aid road fund was originally created.

"When the legislature of 1925 met in regular session it was apparent to the state as a whole that insufficient progress was being made in the construction of permanent highways. Certain counties, induced by chambers of commerce and other good roads enthusiasts, had made commendable progress in the construction of highways. Other counties lagged behind, with the result that roads started out as good roads and traversed one county in passable condition, connecting with sadly inferior roads at the limits of adjoining counties. It was recognized that in order for Kansas to progress in road construction, special assistance must be given to some counties and sections of the state, and further that the funds available for road construction from sources other than direct taxes must be increased.

"Consequently the first act of the legislature with reference to the road program was chapter 274 of the Session Laws of 1925, which imposed a tax on gasoline of 2 cents a gallon. Section 10 of that act stated that the object thereof was to create a fund for the construction and maintenance of roads. It provided that all of the tax collected from each county should be by the state treasurer paid over to such county on the first day of each month, and placed in the general road fund of the county. This act was approved on March 2, and by its terms took effect on the first day of May.

"Two weeks later the legislature passed and the governor approved chapter 214, which by its terms was to take effect July 1, 1925.

"Section 4 of chapter 214, changed, as of July 1, 1925, the provisions of the gasoline tax act, which as before stated was to become effective on May 1, 1925. The difference between the effective dates of these two statutes is one of the causes for the controversy involved in this litigation.

"By the terms of chapter 214 the highway commission was changed to consist of three members, who, acting in conjunction with boards of county commissioners, were instructed to designate certain highways in each county the total mileage of which should not be less than the sum of the north to south and the east to west diameters of the counties. The highways so designated constituted the state highway system, and section 2 provided that it should be constructed, improved and maintained by the boards of county commissioners, under the supervision of the state commission, from funds created by the act.

"The funds referred to were the motor-vehicle registration fees and the gasoline tax. After the deduction of the 50-cent fee to the secretary of state, 25 per cent of the motor-registration fee was allocated to the various township road funds. The remaining 75 per cent was to be transmitted monthly by the county treasurer to the state, and placed in the state highway fund. Likewise, all money derived from gasoline tax was to be placed in the state highway fund.

"From the state highway fund thus created out of 75 per cent of the motor-vehicle registration fees and all of the gasoline tax $300,000 quarterly was set aside in a fund designated as a state-aid road fund, to be expended in the several counties of the state under the direction of the state highway commission, in the giving of state aid where the same might be needed within the limits of the constitution. After deducting an appropriation for the maintenance of the highway commission, the balance of the state highway

fund was to be distributed to the counties, 40 per cent being divided equally between all of the counties of the state, and the remaining 60 per cent to be divided among the counties of the state in proportion to their assessed valuation. This distribution was to be made semiannually, on March 1 and September 1, and the fund thus created in the several counties by such distribution was to be used in the construction and maintenance of state roads in the counties.

"It was provided, however, that counties might, at their option, expend 20 per cent of these semiannual distributions of the state highway fund on county and township roads and bridges.

"The constitutionality of this act was upheld in the case of the *State, ex rel., v. Gardner,* 122 Kan. 508.

"Under the terms of this act, as of July 1, 1925, there existed in the hands of the state treasurer, in so far as the highways are concerned, three funds, a state-aid road fund, a state highway fund and fund for the maintenance of the highway commission. The parent fund out of which the others were taken was the state highway fund. From it in the state treasury was taken $300,000 quarterly, such sum containing the state-aid road fund. From it was further taken any appropriation by the legislature for the maintenance of the highway commission. The balance of the state highway fund was distributed to the county treasuries in the proportion set out above.

"In the counties were numerous funds dealing with roads and bridges. Chief among them was the county and state road fund, to be used in the construction and maintenance of state roads in the counties, and made up of the semiannual distribution from the state highway fund.

"Likewise, there was created, lawfully or otherwise, in many counties a special fund to be expended on county or township roads and bridges, and made up of 20 per cent of such distribution. There also existed the county general road fund, township road funds and both county and township bridge funds, consisting of funds raised for the purposes indicated by general tax levies within the county. There also existed special-aid funds for benefit districts, and so far as any express repeal is concerned there likewise existed the special drag fund, although there was no provision in law for any additions to that fund, since the registration license fee which had formerly replenished that fund had been diverted to the state highway fund.

"The state-aid road fund in the several counties, which had been created by the Laws of 1917 and which had formerly received a portion of the registration fees, was likewise not expressly abolished, although it is probable that the last sentence in section 4 of chapter 214 of the Laws of 1925 intended to transfer the unexpended balance in such fund to the principal road-building fund now known as the county and state road fund.

"The legislative session of 1927 further amended the road laws of the state in many particulars. By chapter 255 the highway commission was increased to six members, and the possible appropriation for its maintenance was increased to $150,000 a year. Again the legislature authorized deduction from the highway fund of $300,000 quarterly, to be placed in the state-aid road fund, and then after deducting the cost of maintaining the highway commis-

sion, the balance of the state highway fund was said to constitute a county highway fund.

"A new fund was created, known as the county free fund, and composed of $100,000 quarterly, deducted from the county highway fund, to be used as an emergency fund for closing gaps in the counties where other funds were insufficient. The balance remaining in the county highway fund was then to be distributed on the same 40 per cent and 60 per cent basis, as provided by the law of 1925, but the distribution, instead of being made semiannually, was to be made quarterly, commencing January first, and this distribution was still to be designated in the several counties as the county and state road fund, and to be used in the construction, improvement and maintenance of roads and bridges comprising the state highway system.

"The previous option of expending 20 per cent of this fund on county and township roads and bridges was made mandatory on the part of the county commissioners. Provision was further made for the use of such fund in such counties as had then or might thereafter have completed the construction of such part of the state highway as lay within the limits of their county. The act of 1927 further provided that in the event a county failed to use the 80 per cent of the county and state road fund for the construction, maintenance and improvement of said highways, the unused portion should revert to the state-aid road fund.

"The law, of 1927 provided, as did that of 1925, that the building of the state highway system in any county was to be under the direction of the county commissioners and subject to the approval of the state highway commission.

"In 1927, government officials at Washington having ruled that under a change in the federal road act adopted by congress November 9, 1921 (42 Stat. 212), our state would be denied federal aid for its roads after June 30, 1929, unless the constitution of the state could be amended so as to permit the direct building of highways by the state itself instead of by the several counties under the supervision of the highway commission, Governor Paulen called a special session of the legislature which convened on the 19th day of July, 1928. This special session authorized the submission of another good roads amendment to our state constitution, again amending section 8, article 11, to expressly permit the state to adopt, construct, reconstruct and maintain a state system of highways. This proposed amendment was submitted to the people of the state of Kansas at the general election in 1928, and by them approved.

"The legislature of 1929, by the provisions of chapter 287, increased the gasoline tax on motor vehicles to 3 cents a gallon, which the state treasurer was authorized to credit to the gasoline tax fund, to be used for the construction, improvement and maintenance of roads and highways.

"By the terms of chapter 225 of the Session Laws of 1929, as authorized under the recently adopted constitution amendment, the state highway commission was recreated to consist of six members, and the highways of Kansas were reclassified with the power given to the state highway commission, itself, to designate state highways in every county of the state, with a total mileage

in each county not less than the sum of the north to south, east to west diameters. All highways in the state, save those designated as state highways by the state highway commission, were classified as county roads or township roads. State highways were to be constructed and maintained by the state highway commission, instead of as heretofore by the counties under the supervision of the state highway commission.

"Section 17 of chapter 225 created a state highway fund. Into this fund was to go all of the motor-vehicle tax except the usual nominal fees for the license, etc., and all of the gasoline tax. Likewise into the same fund was to go the unexpended balance remaining in the several counties in any of the previous funds created by chapter 255 of the Laws of 1927. Provision was further made for the transfer of the proceeds derived from the sale of bonds in connection with benefit-district roads from the county treasurer to the state treasurer, and the expenditure of such sums in the counties for the purposes for which the bonds were issued. The law provided further sources of income to the state highway fund which are not material to this litigation.

"From the fund so created was the first to be deducted such appropriation as the legislature might make for the maintenance of the highway commission and the highway department, not exceeding $500,000 annually. Then the sum of $800,000 quarterly up to April 1, 1930, and the sum of $900,000 quarterly thereafter was to be transferred by the state treasurer from the highway fund into the county and township road fund, to be distributed to the counties on the 40-60 basis heretofore in effect, and to be used by the county commissioners in the several counties on county and township roads and bridges, without any supervision or direction or control on the part of the state highway commission.

"There was next set apart the sum of $700,000 quarterly, to be used by the state highway commission in the several counties for reimbursement to benefit districts for benefit-district assessments and for the payment of the principal on all outstanding warrants issued by any county for the construction, improvement or maintenance of the state highway system, and for the further purpose of maintaining that portion of the highway system within the county, and finally, the balance to be expended for constructing state highways.

"After some other minor deductions, it was then provided that all of the remainder of the highway fund might be used by the highway commission in building and maintaining the state highway system, with limitations as to the mileage and type of roads to be built.

"Section 19 of chapter 225 of the Laws of 1929, in view of the fact that the act itself was to take effect on April 1, 1929, and in further view of the fact that the act transferred from the several counties to the state highway commission both the task and expense of maintaining the roads constituting such system, provided that the boards of county commissioners should transfer to the highway system all material and equipment which had previously been purchased from the county and state road fund for use on the state highways.

"The same section no doubt anticipated that the several counties had incurred obligations in the construction of state roads, and realizing that the act in question was to take from these counties the funds with which to meet

such obligations, provided that the highway commission should assume both the rights and liabilities of the several counties on all existing contracts for the construction, improvement or maintenance of state highways and bridges, or for the purchases of machinery, equipment or material for use on state highways.

"It is worthy of note that chapter 229 of the Session Laws of 1929 sought to authorize the several counties to enter into agreements with the state highway commission by the terms of which the counties themselves were to finance the state highway work in their counties, obtaining repayment therefor from the state highway commission as state highway funds were available. The same chapter provided that the counties were, however, neither to issue bonds nor borrow money in this financing.

"The constitutionality of this chapter was passed upon adversely by the supreme court in the case of the *State, ex rel., v. The Commissioners of Saline County,* in volume 128, Kansas Reports, page 437, in which the court held that the proposed loaning of funds raised for one purpose to the state highway commission for use for another and different purpose was in direct contravention of section 4 of article 11 of our state constitution.

"Our only justification for enlarging this report to include this summary is that in our research in this case we have found no previous summary to have been made, and it does afford a background on which to base an understanding of the issues and questions directly involved."