No. 31,514

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general, etc., and SCOTT PFUETZE, as County Attorney of Riley County, *Plaintiffs,* v. JOHN TOY, C. L. GOODE and A. H. TOBUREN, as the Board of County Commissioners of the County of Riley, *Defendants.*

(23 P. 2d 601.)

Opinion filed July 8, 1933.

*Roland Boynton,* attorney-general, *Scott Pfuetze,* county attorney, and *Charles Hughes,* of Manhattan, for the plaintiffs.

*Fred R. Smith, Raymond E. Smith, Gerald F. Smith, Hal E. Harlan* and *A. M. Johnston,* all of Manhattan, for the defendants.

The opinion of the court was delivered by

HUTCHISON, J.: This is an original proceeding in mandamus, brought by the state of Kansas on the relation of the attorney-general of the state and the county attorney of Riley county, for a writ requiring the board of county commissioners of Riley county to issue the funding bonds of the county in the sum of $103,671.76 and dispose of them in the manner prescribed by chapter 319 of the Session Laws of 1933, for the purpose of discharging and refunding the indebtedness specified in sections 3-B and 3-C of the amended notice and financial statement posted and published by the defendant board on June 19, 1933. An alternative writ was issued, and the defendant members of the board have returned the writ according to the command thereof and filed a motion to quash the writ.

Chapter 319 of the Laws of 1933 is what is generally known as the cash-basis law. In the recent opinion rendered in the case of *State, ex rel., v. Board of Education,* 137 Kan. 451, 21 P. 2d 295, holding this act constitutional and valid, this law was described as follows:

"The act pertains to the indebtedness of subdivisions of the state authorized by law to raise money by taxation and to expend the money so raised in performing their respective governmental functions. Broadly speaking, it is designed to have such governmental units operate their respective functions on a cash basis—not to spend money they do not have or incur obligations they cannot meet promptly." (p. 452.)

The items involved in this proceeding specified as above in sections 3-B and 3-C are described as being amounts overdrawn as therein stated, viz., county general fund $44,028.22, county poor fund, $39,355.54, and five road and benefit-district projects in the sum of $20,288, making the total of $103,671.76. These overdrafts have all been paid by the county out of two other funds in which there was money in excess of the immediate demand therefor, namely, the county road fund and the county bridge fund. There is, therefore, no outside third party holding any warrant or other evidence of indebtedness against the county or claiming anything from the county on account of such overdraft. The outside indebtedness has been paid by borrowing the funds necessary therefor from the county road fund and the county bridge fund.

It is contended by the defendants that there is no authority vested in the board to replenish such overdrawn accounts or create

a new indebtedness; that chapter 319 of the Laws of 1933 is not a revenue-raising measure, but it limits the power and authority of defendants to paying legal debts and obligations; that overdrawn funds are not debts or obligations within the meaning of the act; that a debt or obligation must be predicated upon some sort of a contract, express or implied, in which connection there must be at least two persons or parties, whereas here we have only one involved, viz., the county.

There can be no serious contention as to the usual and general meaning of the words, "debt" and "obligation," or the fact that they are predicated upon an express or implied contract, yet when one by check overdraws his account at the bank to satisfy an existing indebtedness, the debt is paid when the bank honors the check, but impliedly a new debt to the amount of the overdraft is immediately created, and it lacks none of the elements of an implied contract. When the debt or obligation of the poor fund in this case was by the county satisfied and paid out of the bridge fund in its hands, was a new debt or obligation created? Two strong arguments are presented in the negative, viz., that there is only one party handling the transaction, and that the constitution, article 11, section 4, requires that "no tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same; to which object only such tax shall be applied."

We are here confronted with the fact that the county bridge and the county road taxes have been misapplied. Is there anything wrong in now trying to correct that mistake? If it were a clerical mistake, it would be corrected immediately upon discovery. Here it is a deliberate misapplication attempted to be exonerated by the excuse of dire necessity. If the issuance of these bonds will make it possible to restore to these two funds the amounts wrongfully borrowed or taken therefrom, it will be in obedience to the constitutional inhibition that the funds be applied to the proper purposes only.

We think it is not clear or conclusive that there is only one party here concerned, or that the county has been dealing with itself in reaching the present status of the several funds here concerned, three of them being overdrawn to the amount here involved, the overdraft being taken from two others having a surplus. Are not each of these separate funds integral units of the whole financial

system of the county? They are each sustained by separate proportions of the general levy, or by specifically separate levies, and each, while a part of the whole, is a separate unit.

In the recent case of *State, ex rel., v. State Highway Comm.*, 132 Kan. 327, 295 Pac. 986, where the state highway commission objected to reimbursing McPherson and other counties for funds paid out by them for the construction of highways, because the outstanding debts and obligations had already been paid by the counties, it was held:

". . . A resulting duty devolved upon that body to adjust and settle with the counties for moneys expended by them on roads of the state system, which moneys had been advanced from miscellaneous county funds when the fund properly chargeable therewith was temporarily depleted. . ." (Syl. ¶ 1.)

This was not by way of approval of such misappropriation of funds, but was only to uphold the new highway act as a means to avoid the predicament in which many counties found themselves with temporary overdrafts in some of their funds to pay warrants properly chargeable to other funds. This decision frequently refers to these previous transactions as resulting in the making of overdrafts, or borrowing from one fund for the use of another. In the case at bar, as in that case, we cannot and do not approve such misappropriation of funds, but this refunding act, like the highway act, seeks to remedy the present existing situation in which these funds are found and prevent the recurrence of such a predicament.

If there has been a borrowing of one fund for the payment of the debts of another fund, there is certainly such a separate entity in the right to the use of the particular fund as to support the relation of one to the other as that of borrower and lender and create a debt or obligation, although done irregularly and without legal authority. We cannot, therefore, concur in the contention of the defendants that the overdraft sought to be paid or refunded in this case by the issuance of bonds is not a debt or obligation within the general meaning of those words.

It was said in the case of *State, ex rel., v. Saline County Comm'rs*, 128 Kan. 437, 278 Pac. 54, that "each of the funds is distinct from the others." At the same time the court condemned and disapproved the practice of loaning to or borrowing from one or the other as being in violation of the constitutional provision above cited.

Under the provisions of this act we are not confined to the matter

of simply paying or refunding these debts and obligations, for in the second and seventh sections of the act there are provisions for refinancing them, which is more comprehensive and permits and embraces the readjusting of the financial relations between the several funds covering, as in the case of *State, ex rel., v. State Highway Comm.*, supra, the matter of overdrafts and borrowings, without justifying such.

Again, the act itself distinctly recognizes the existence of these irregularities of which we are speaking, by requiring, in section 3, under three different headings, that the municipality set out as a part of its outstanding indebtedness—

> "(B) Amount of overdrawn funds other than bond funds," etc.;
>
> "(C) Amount of overdrawn bond funds," etc.;
>
> "(D) Amount of overdrawn funds for which no tax levy was made for the current year. . ."

It is true that some of these references to overdrawn funds may relate to cases where warrants have been issued, registered and not paid for want of funds, but they are not all of this kind or character.

The act requires the listing by the board of all these matters of indebtedness, overdrafts included, and posting the same. It also provides for the amendment or correction of any of the items and for an appeal from such amended list, and then provides that—

> "Any municipality which has complied with all the provisions of this act is hereby authorized to fund such indebtedness (viz., the indebtedness as shown on the final published statement of the municipality), including the accrued interest thereon, if any, to July 1, 1933, and to issue bonds of the municipality for the purpose of paying or refinancing said indebtedness." (Sec. 7.)

The three items here in question, totaling $103,671.76, were included in the final published statement; they passed the scrutiny of the defendant board of county commissioners, and any ten taxpayers of the county had the right to appeal to the district court, and also to the supreme court, if any objection was had to the statement or any of the items therein. No appeal was taken, and by such authorization, above quoted, the refunding to be done is of the indebtedness shown in the published statement.

But, aside from the detailed provisions of the act permitting and authorizing the doing of certain things, the duty of the defendant members of the board in this case must be learned from a careful construction of the act as a whole so as to give effect to the evident intent and purpose of the legislature. As was said in 59 C. J. 961—

"In construing a statute to give effect to the intent or purpose of the legislature, the object of the statute must be kept in mind, and such construction placed upon it as will, if possible, effect its purpose, and render it valid, even though it be somewhat indefinite. To this end it should be given a reasonable or liberal construction."

The act itself provides, in section 9, that "this act shall be liberally construed for the achievement of said objectives." The title of the act is—

"An act in reference to indebtedness of cities, counties, townships, boards of education, municipal universities, school districts, high-school districts, drainage districts, and other municipalities, and providing for the funding of the same, and prohibiting the drawing of warrants or making of contracts under certain circumstances, and providing penalties for the violation of this act."

Section 2 of the act plainly and definitely states the two-fold purpose of the act, first, to pay or refinance the valid indebtedness of the municipality, and then provides for the future operation of all financial affairs to be upon a cash basis. It is as follows:

"All municipalities are required to pay or refinance their valid indebtedness as in this act provided, in the manner and at the times herein set forth, and to contract no indebtedness after May 1, 1933, except as herein provided. It is hereby declared that the purpose of this act is to provide for the funding and payment of all legal debts and obligations except present bonded indebtedness of all municipalities and for the future conduct of the financial affairs of such municipality upon a cash basis."

Sections 12 and 13 specifically limit all financial transactions of the future to a cash basis in the following language:

"Unless otherwise provided in this act, it shall be unlawful after May 1, 1933, for the governing body of any municipality to create any indebtedness in excess of the amount of funds actually on hand in the treasury of such municipality at the time for such purpose, or to authorize the issuance of any order, warrant, or check, or other evidence of such indebtedness of such municipality in excess of the funds actually on hand in the treasury of such municipality at the time for such purpose." (Sec. 12.)

"Unless otherwise provided in this act, it shall be unlawful after May 1, 1933, for any member of any governing body of any municipality to knowingly vote for or in any manner aid or promote the passage or adoption of any order, motion, ordinance, resolution, legislation or other act of said governing body, creating an indebtedness in excess of the amount of funds actually on hand in the treasury of such municipality at the time for such purpose, or to knowingly vote for the drawing of any order, warrant or check, or other evidence of such indebtedness on the treasury of said municipality, in payment of any such indebtedness, in excess of the amount of funds actually on hand in the treasury at the time for such purpose." (Sec. 13.)

Sections 14, 15, 17 and 18 prescribe the duties of the secretary and treasurer of such municipalities in carrying out the purpose of the act as expressed in the previous sections. Section 20 imposes a punishment upon all officers who violate any of the provisions of the act.

It is admitted by all parties hereto that the cash basis in Riley county would be an impossibility under the provisions of this act without the refunding or refinancing of the three overdrawn items here under consideration. With the cash basis as the ultimate purpose of this act, made possible only by the refunding or refinancing of debts and obligations of the municipality, as authorized and permitted in the act, we have no difficulty in concluding that such necessary refunding and refinancing was as much the evident intention and purpose of the legislature as the cash-basis feature thereof, and, in this particular case, that it would include and authorize the refunding and refinancing of the overdrafts in the three funds which had previously, irregularly and even without authority, been met and paid out of two other different and separate funds.

"As the intention of the legislature, embodied in a statute, is the law, the fundamental rule of construction, to which all other rules are subordinate, is that the court shall, by all aids available, ascertain and give effect, unless it is in conflict with constitutional provisions or is inconsistent with the organic law of the state, to the intention or purpose of the legislature as expressed in the statute." (59 C. J. 948.)

"In the interpretation and construction of statutes the primary rule is to ascertain and give effect to the intention of the legislature. As has frequently been stated in effect, the intention of the legislature constitutes the law. All rules for the interpretation and construction of statutes of doubtful meaning have for their sole object the discovery of the legislative intent, and they are valuable only in so far as, in their application, they enable us the better to ascertain and give effect to that intent." (25 R. C. L. 960.)

"A primary rule for the construction of a statute is to find the legislative intent from its language, and where the language used is plain and unambiguous and also appropriate to the obvious purpose the court should follow the intent as expressed by the words used and is not warranted in looking beyond them in search of some other legislative purpose or of extending the meaning beyond the plain terms of the act." (*Alter v. Johnson,* 127 Kan. 443, syl. ¶ 1, 273 Pac. 474.)

"In construing a statute the court may look to the history of the times, to the causes which induced its enactment and to the object sought to be attained." (*State, ex rel., v. Davis,* 114 Kan. 283, 287, 217 Pac. 905.)

All the reasons assigned by the defendants as to why they should

not be required to refund or refinance the indebtedness mentioned in the application for the writ have been fully considered and over-ruled.

The motion to quash the alternative writ should be denied and a peremptory writ allowed. It is so ordered.

JOHNSTON, C. J., not sitting.