No. 30,839

THE STATE OF KANSAS, ex rel. J. F. BENNETT, County Attorney of Norton County, *Plaintiff*, v. THE STATE HIGHWAY COMMISSION, *Defendant*.

No. 30,968

THE STATE OF KANSAS, ex rel. ROLAND BOYNTON, Attorney-general, *Plaintiff*, v. THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF NORTON, *Defendant*.

(26 P. 2d 606.)

The opinion of the court was delivered by

SMITH, J.: These two actions are original proceedings in mandamus—one brought by Norton county against the highway commission and the other brought by the highway commission against Norton county.

The purpose of the two cases is to determine the condition of the county and state road fund of Norton county on April 1, 1929.

The questions arise from the operations of Norton county and the state highway commission during the operative period of chapter 214 of the Laws of 1925. It was this statute that provided that the state highway system should be constructed, reconstructed, improved and maintained by the boards of county commissioners of the several counties subject to the supervision of the state highway commission (sec. 2); also that all contracts should be let by the county commissioners and approved by the state highway commission (sec. 6); also that the construction and maintenance should be subject to the approval of the state highway commission and under the direction of the county commissioners. It was the plan adopted by the legislature to meet the requirements of the federal authorities that they would deal only with states.

The fund in question was called "county and state road fund." It was made up of gasoline taxes and automobile license fees, and the statute required that the money thus raised from the entire state should be distributed to the counties. Forty per cent of this money was distributed to each county equally. Sixty per cent was distributed to the counties on the basis of the assessed valuation of each county.

With some changes not necessary to notice here the business of

road building was carried on under this statute until the passage of chapter 225 of the Laws of 1929, which took effect April 1, 1929. This is the statute that was enacted pursuant to the last highway amendment to the constitution. Under its provision the state itself, acting through the highway commission, assumed the duty of constructing, reconstructing, improving and maintaining that portion of the highways of the state in each county designated as a part of the state highway system.

Since the county commissioners had been doing the work under the supervision of the highway commission, when the state itself took over the work it became necessary that there be an adjustment of accounts between the several counties and the commission. The act of 1929 contained the following provision with reference to this:

"That on April 1, 1929, the boards of county commissioners of the various counties shall transfer to the state highway commission and deliver to its authorized representatives all machinery, equipment and road materials which said counties have heretofore purchased from the county and the state road fund of such counties for use on state highways. That on April 1, 1929, the state highway commission shall assume the rights and liabilities of the various counties on all existing contracts for the construction, improvement, reconstruction, or maintenance of state highways and bridges and for the purchase of machinery, equipment or material for use on state highways." (Laws 1929, ch. 225, sec. 19.)

Under that section it became the duty of the boards of county commissioners and the highway commission to adjust their respective rights and liabilities in reference to the county and state road fund as of April 1, 1929. In the case of Norton county there was an attempt to do this. The result of that attempt was a payment to Norton county by the highway commission of $22,512.30 on July 25, 1929. On March 30, 1932, the state, on the relation of the county attorney of Norton county, filed one of these actions. In that action it was claimed that the settlement was not correct. It was sought to compel the highway commission to pay to Norton county $21,137.51 in addition. On June 22, 1932, the state, on the relation of the attorney-general, filed the other mandamus action. In that action it was claimed that Norton county was paid too much in the settlement of July 25, 1929. It seeks to compel Norton county to pay to the state highway commission the sum of $23,515.07. It should be noted here that the settlement of July 25, 1929, was made subject to any changes which it would be found necessary to make under the laws of the state. Neither party is seriously urging the

matter of accord and satisfaction. As soon as these two actions were filed, expert accountants set to work on the books of the county. The result of this was that the claim of Norton county was reduced to $1,709.24, while the claim of the highway commission remained the same.

The cases were consolidated, and the parties stipulated as to the facts. It is conceded by both parties that the books of Norton county were not correctly kept, and the questions that arise in these cases go largely to the manner in which both parties claim the county and state road fund should appear on the books of the county.

There are three major questions to be decided in these cases.

The first difference urged concerns an item of $3,624.16, which the county claims it spent on the state highway system in the county and for which it claims it should have credit.

This amount is the total of various warrants drawn by the county engineer against the county and state road fund for the construction and maintenance of roads comprising a part of the state highway system, approved by the board of county commissioners for payment out of the county and state road fund and charged by the county treasurer against the county and state road fund, but not shown on M-6's as approved charges by the state highway commission.

Just what the known facts are with reference to this fund may best be stated by quoting from the stipulation. There we find the following statement:

"15-D. The M-6's herein referred to were forms listing approved expenditures and provided for the purpose of evidencing the approval of charges against the county and state road fund, in conjunction with a form known as M-5. The M-5 was a form on which space was provided for the listing of each voucher approved by the board of county commissioners for funds expended for materials, supplies and labor or other necessary items in connection with the maintenance and betterment work on highways designated as part of the state system of highways. Each month's expenditure, as listed on form M-5, was summarized on the form M-6, and periodically a representative of the state highway commission would inspect and approve or disapprove the charges as set out by the officials of the county on the forms M-5, and such approval constituted the approval by the state highway commission. The charges thus listed upon the M-6's constituted the authorized charges to be made against the county and state road fund.

"15-E. The state highway commission contends that inasmuch as said items are not shown on the forms M-6 they were never approved, the practice being to list on the form M-6 only approved charges. That said charges, never having been approved by the state highway commission as a proper charge

against the county and state road fund (the 80 per cent of said fund required to be expended subject to the supervision and approval of the state highway commission), should not now be charged against said fund in making a recast of the county treasurer's ledger for the purpose of ascertaining the true balance remaining in said fund on April 1, 1929. The state highway commission contends that the warrants must be charged against the optional 20 per cent, and in making a recast of the account (Ex. 2, p. 1, line 18, col. G), has charged said sum in the amount of $3,624.16, against the said optional 20 per cent fund.

"Norton county, on the other hand, contends that said sum should be charged against the 80 per cent of the county and state road fund and has therefore included it in the warrant charges shown on exhibit 2, page 1, line 13, column F, making the difference shown on the same line under column H.

"15-F. Norton county contends that inasmuch as said items were for work done upon the state system of highways, that vouchers for such work were approved by the county engineer and the county commissioners and posted by the treasurer as proper charges against the county and state road fund, that said items now constitute a proper charge against the county and state road fund (the 80 per cent of said fund), and that in recasting the said fund the said items should not be eliminated merely because they do not appear upon the forms M-6 as approved charges."

The county argues that since there is nothing in the record which shows that these items were presented to the commission and rejected, and no reason appears why they would have been rejected had they been presented, the county should have credit for them and should not be penalized by the negligence of its officers.

It will be seen that the method described was the only way the highway commission could supervise or control the building of the state highway system during the operation period of the 1925 act. The authority that controls the purse strings is the authority that controls the work. For this court, seven years after the expenditure of the money, to order the payment of these items out of the county and state road fund would be to say that the items were proper charges against the fund. There are no facts before us upon which we may base such a conclusion. The fact that the vouchers are approved by the county engineer and the county commissioners does not avail the county here, for the reason that twenty per cent of the money sent to Norton county could have been expended on the state highway system if the county commissioners had seen fit to so spend it. In that case the vouchers would have needed the approval of the county engineer and county commissioners, but not that of the highway commission. For all we know, that is what happened here. We know that the approval of the highway commission was not a

matter of form, but was necessary before a voucher could properly be paid out of the county and state road fund.

We have concluded that the contention of the highway commission is correct with reference to the item of $3,624.16.

The next item in dispute is $10,168.17, which is the difference in the contentions of the parties as to the twenty per cent of the money that was sent to the county under the act of 1925. After providing for the disbursement to the different counties of the gasoline tax money and the automobile license fees, section 4 of chapter 214 of the Laws of 1925 contained the following provision:

"That not more than twenty per cent (20%) of said fund may be expended on county or township roads or bridges at the option of the county commissioners."

During the operative period of the 1925 act the state sent $68,-961.68 to Norton county. Of this the county treasurer credited $13,-792.33 to the county road fund. We have seen that $3,624.16 was spent on the state highway system in Norton county but was not approved by the state highway commission, hence could not be charged to the county and state road fund. This leaves $10,168.17 which the county claims was spent on the county and township roads under the optional provision of the law. This subject was treated in State, ex rel., v. State Highway Comm., 132 Kan. 327, 295 Pac. 986. In that case it was held that the provision quoted did not confer authority on the county to set aside twenty per cent of the money received as a separate fund to be used on county and township roads and bridges. In other words, the provision was that the money might be expended, and it was not to be taken out of the county and state road fund until it was expended on county and township roads. The contention of Norton county is that the money was actually expended on county and township roads and that this constituted an exercise of the option. On the other hand, the state highway commission contends the money was not spent on county and township roads and there was no exercise of the option. If the county commissioners did not exercise their option to expend the money on county and township roads and bridges, then the money should still have been in the county and state road fund for Norton county on April 1, 1929. We must base our conclusions on this matter entirely on the agreed statement of facts which the parties have made. It is agreed first that the county treasurer credited the

county road and bridge fund with this money. All parties also agree that this does not constitute an exercise of the option.

In paragraph 17-CC. of the agreed statement of facts we find the following:

"The state highway commission further contends that inasmuch as the journal of the county commissioners for the period in question was not destroyed by the fire in the courthouse above referred to, but is still in existence, and inasmuch as said journal does not show any resolution of the board of county commissioners directing the treasurer to post 20 per cent of the distributions of the county and state road fund as received by the county to the county road fund, and inasmuch as no evidence has been produced indicating even knowledge on the part of the board of county commissioners that such postings had in fact been made, that there is no evidence from which it can be determined that the board of county commissioners attempted to exercise the option given it under the provisions of the 1925 road act to expend 20 per cent of the distributions of the county and state road fund upon county or township roads."

The presumption to be drawn from the above statement is that the county commissioners did not order the expenditure of this money from the county and state road fund, and that it is doubtful if they knew of such transfer. The warrants drawn on the fund were not marked so that the fund from which they were to be paid might be distinguished in any way. It is certain that money was spent on county and township roads. The question is whether this money was intended by the county commissioners to be spent out of the so-called twenty per cent money or was intended to be spent by them out of the money raised by the regular levy. We can only arrive at a conclusion on this question by a study of the circumstances.

The most persuasive of the circumstances considered is the fact that the county commissioners were using every available dollar to carry on the work of constructing the state highway system. This was done in some instances when it was questionable whether the commissioners or treasurer had any authority or right to make the transfer of funds. Indeed, the next item to be treated in this opinion is one where Norton county claims an illegal diversion of funds.

The county commissioners in this case had the option of using the money in question on the state system or on county and township roads. Since they had this option with reference to the money, it would be a violent assumption on our part to assume that they used this money on county and township roads and used money about

which there was a doubt as to their authority on the state highway system.

The holding of this court in *State, ex rel., v. State Highway Comm.*, supra, is relied on by Norton county. In that case the court in treating this question said:

"The board decided to exercise its option and set apart the authorized 20 per cent under the act of 1925, placing it in the county drag fund, but a considerable part of this money was not then needed for local road purposes and was not thus expended." (p. 334.)

The findings of fact of the commissioner in that case were quite plain on this point. The commissioner found that the funds were transferred "on the orders of the county commissioners." There is nothing in the agreed statement of facts in this case that might warrant any conclusion that the commissioners had ordered the transfer of twenty per cent of the county and state road fund from that fund to the county road fund, or that the commissioners had ordered or knew of the expenditure of any such a fund on the county and township roads. We therefore have concluded that the contention of the highway commission is correct as to this item, and that Norton county should repay to the state highway commission $10,168.17 in addition to the $3,624.16 heretofore treated in this opinion.

The next item in dispute between the parties is the sum of $7,869.35 which the county claims was illegally diverted from the county road and bridge fund into the county and state road fund.

During the operative period of the 1925 act the construction of the road which brought about these questions was initiated. The road was contemplated and actually constructed as a federal-aid project. We have seen that during this time the counties carried on the actual work of constructing these roads, but it was done under the supervision and subject to the control of the state highway commission.

We have seen that the state aided in the carrying on of this work with funds raised by means of the gasoline tax and automobile license fees. This money was augmented by what was obtained from the federal government, and in many cases by funds raised in the counties by a regular levy. It was the use of the latter funds that gives rise to this case.

It will not be necessary to give a detailed account of the manner

in which this particular project was initiated and finally carried to completion. A brief examination, however, will be helpful.

To initiate the improvement the county commissioners adopted a resolution which provided that the improvement should be made "by the use of county and state road fund and bridge fund." The resolution found that the improvement in question was of immediate necessity and of general public utility, and stated that there was available the sum of $10,000 "from the bridge fund" to make such improvement. It ordered a survey to be made by the county engineer, and "hereby appropriated and set aside . . . the sum of $10,000 . . . from the bridge fund."

The county attorney approved these proceedings. The county commissioners passed another resolution resolving the road in question be improved as a federal-aid road, the construction and maintenance to be carried out under the direct supervision of the state highway commission "acting as agent for said county" as required in the federal-aid road act and as authorized in chapter 264 of the Laws of 1917. This resolution contained a proviso "that this board pledges the good faith of said Norton county to construct this improvement and maintain said road as required in the federal-aid road act and the laws of Kansas." These documents were forwarded to the state highway commission, which adopted a resolution determining to make the improvement as a federal-aid road. In due time the entire project was approved by the bureau of public roads. The arrangement at that time was that the entire project would cost $108,813.10. This included $65,539.30 for earthwork and culverts and $43,273.80 for bridges. The federal government agreed to furnish $32,643.93 of this amount and required the state to furnish $76,169.17. The state highway commission sent this statement to the county. The county commissioners set aside for the purpose of matching federal aid the following:

"(1) From general road and bridge fund (ch. 68, R. S. 1923) ........................... $20,000.00

"(2) County and state road fund (ch. 214, Laws of 1925) ............................. 47,627.37

"(5) State-aid road fund (ch. 214, Laws of 1925), 8,541.80"

Later a request for $10,000 additional was made on the federal government. This was approved, making fifty per cent of the entire cost of the project to be furnished by federal aid. When the

road was finally completed the cost was, earthwork and culverts $61,931.53, bridges $28,996, or a total of $90,927.53. When the affair was finally settled it was found that $7,869.35 of the money that had been raised by a tax levy for the purpose of building bridges in the county had been expended by the county commissioners on bridges located on this portion of the state highway system.

Norton county argues that the county commissioners had no authority to spend this money on the state highway system, and that on this account the amount should not have been paid out of the county bridge fund but should have been paid out of the county and state road fund.

The constitutional provision upon which the county relies is as follows:

"No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object only such tax shall be applied." (Const., art. XI, sec. 4.)

The statutes under which the fund in question was raised are 68-1101 *et seq.* It is there provided that each June the county engineer shall make a survey of the county to determine what bridges in the county need repair and maintenance work done upon them and shall report the result of his inspection with an estimate of the cost to the county commissioners for their July meeting. The statutes also provide that at its June meeting the board of county commissioners shall determine what new bridges or culverts shall be built during the next ensuing year and shall furnish a list of them to the county engineer. It is then provided that the engineer shall visit the site of each bridge and shall submit the estimated cost of all of them to the county commissioners at their July meeting. Based upon these recommendations the county commissioners determine the amount necessary to be raised for the repair and construction of bridges. To this they add twenty per cent for an independent bridge fund. The statute then provides for the publication of notice of a public meeting, which notice shall give the location and the estimated cost of each structure to be built or repaired, and that after the public meeting the board shall make an order stating the location of the bridges and culverts to be constructed and repaired and the amount of money to be appropriated for such bridges and culverts. The statute then has the following provision:

"The board of county commissioners at the time prescribed by law for levying county taxes shall levy a tax of not more than one and one-half mills on the dollar on all taxable property in the county, to be collected as other taxes, and when collected shall be expended for the repairs and construction of bridges and culverts. The board of county commissioners shall not be prohibited from using bridge funds on other bridges than the ones designated when in their judgment necessary." (R. S. 68-1102.)

Section 2 of chapter 214 of the Laws of 1925 is as follows:

"That the state highway commission, in conjunction with the boards of county commissioners, shall designate in every county in the state certain highways, the total mileage of which shall not exceed 8,690 miles, and the total mileage of which in each county shall not be less than the sum of the north to south and the east to west diameters of the counties and which shall connect the county seats and principal cities and market centers. Which highways shall constitute the state highway system. Said state highway system shall include all roads heretofore approved by the state highway department and the federal government under the federal highway act. The system of roads thus designated shall be constructed, reconstructed, improved and maintained by the boards of county commissioners of the several counties, subject to the supervision of the state highway commission, from funds hereinafter provided."

Our question is: Was it lawful for the county commissioners to use money raised under the provisions of R. S. 68-1102 to build bridges on a highway which had been designated as part of the state system of roads in the county pursuant to the above section? The answer will require an examination of the statutes relating to highways and bridges.

The argument of the county is that the statute quoted required the highway commission and the county commissioners to set up a system of state highways, and that when this was done these roads became entirely separated from the county as far as taxation is concerned. In this connection the county cites and relies on *State, ex rel., v. Saline County Comm'rs*, 128 Kan. 437, 278 Pac. 14. In that case an act of the legislature of 1929 gave the counties the authority to use and overdraw the county general fund, sinking fund, bond funds, the twenty per cent road fund and the road and bridge funds for the purpose of constructing part of the state highway system in any county. This court held this to be an attempt to divert funds in violation of the section of the constitution relied on here. It will be noted that the act passed on in the case of *State, ex rel., v. Saline County Comm'rs*, supra, attempted to confer authority upon the county commissioners to use funds for road-build-

ing purposes when the statutes creating these funds did not even remotely mention roads, either state or county.

The county in this case points out that R. S. 68-608 authorized the use of county bridge funds on federal-aid projects and was repealed by section 9 of chapter 214 of the Laws of 1925. It should be noted here that R. S. 68-1102 gives authority to county commissioners to make a levy to build bridges on any road in the county, whether part of a state highway or not, as far as any provision in that section is concerned. The question we have is whether later enactments have narrowed the purposes of that statute so that it now only applies to bridges on roads other than those that are now part of the state highway system.

Chapter 214 of the Laws of 1925 provided a comprehensive plan for the coöperation of county, state and federal authorities. It is fair to assume that the authors of the bill were familiar with the statutes then in effect and with the court decisions interpreting them. With this in mind we will examine the provisions of that chapter that bear on our question. In this connection we must note here that it has always been the policy of our state to treat the construction and repair of bridges as a separate and distinct matter from the construction of roads and highways.

In *State, ex rel., v. Franklin County*, 115 Kan. 531, 223 Pac. 261, this court construed R. S. 68-601. That section provided for a fund in the counties to be known as "the state-aid road fund," to be raised by the payment of licenses on automobiles. The statute provided that the fund should be used for the purpose of "aiding in the construction, maintenance and improvement of roads and highways." Franklin county, presuming to proceed pursuant to this act, had constructed a road upon which there still remained a balance unpaid. Considerable money had accumulated in the state-aid road fund for Franklin county, and the county commissioners were about to use a portion of this amount to build a bridge in the county and a portion of it to pay various bills contracted on roads other than permanent roads in the county.

When the right of the county to do this was attacked, this court held that the state-aid road fund could not be used on county roads unless it amounted to enough to more than care for any federal road project then under construction and could not be used for the building of bridges at all. On this point the court said:

"The different sections of the act make it clear that the fund, whether used to meet federal-aid projects or not, must be used for the construction and maintenance of roads. The application of it to the building of bridges is contrary to the terms of the act and against the general policy of the state. In providing for the building of bridges the legislature has drawn a distinct line of demarcation between provisions for bridges and those made for the roads on which they are built. Separate funds are provided for the expense of the construction of each, and different limitations have been prescribed as to the application of the separate funds. A culvert or bridge built at little cost has been treated as a part of a highway, as for instance in the act providing for the permanent improvement of roads, the legislature has enacted that bridges costing less than $2,000 and having a span of less than twenty feet shall be included as a part of the improvement, but those costing more than that amount and of greater span shall be built at the expense of the county under the law providing for the construction of bridges. (R. S. 68-713.) In a provision as to raising funds for the building of county roads, there is a specific declaration that funds so raised shall not be used for the construction or repair of bridges and culverts. (R. S. 68-519.) Throughout the legislation as to bridges there is a manifest purpose that funds shall be raised and kept separate from other funds and many limitations applicable to bridge funds are wholly inapplicable to road funds. (R. S. 68-1101 to 68-1506.) Under the facts and the law the action of the board in using this fund for the building of bridges was unwarranted." (p. 537.)

Of similar import is the case of *State, ex rel., v. Sumner County Comm'rs,* 132 Kan. 870, 297 Pac. 658. There the court had under consideration the question of whether it was the duty of the county or the highway commission to build a bridge that was part of a benefit-district road. The bridge in question was part of a project in course of construction when chapter 225 of the Laws of 1929 went into effect. The county argued that when that chapter went into effect it became the duty of the highway commission to build the bridge. The court held the construction of a bridge was a separate matter from the construction of a road, and that it was the duty of the county to build the bridge under the supervision of the highway commission.

These cases are of interest to us because they hold that the law of this state has always been that a statutory provision raising money for the purpose of the construction of roads and highways should not be construed to mean that it could be used for the construction of bridges.

Section 2 of chapter 214 of the Laws of 1925 provides in part as follows:

"The system of roads thus designated shall be constructed, reconstructed,

improved and maintained by the boards of county commissioners of the several counties subject to the supervision of the state highway commission from funds hereinafter provided."

Note the section speaks of "system of roads." Section 3 of the same act is as follows:

"That when the state roads in any county shall have been completed, the board of county commissioners of such county, with the approval of the state highway commission, shall have the power and authority to construct and maintain an additional system of roads, to be improved with the funds provided for by this act, that shall connect with the state highway system already built in such county."

It is to be noted that the section uses the words "state roads" and is similar to the provision of R. S. 68-601 construed in *State, ex rel., v. Franklin County,* supra. Section 4 of the same act provides for the raising of the money to be used and for its distribution to the counties. Near the end of the section we find the following language:

"The fund thus created in the various counties shall be known as the county and state road fund and shall be used for the construction, reconstruction, and maintenance of state roads in the counties: *Provided,* That not more than twenty per cent (20%) of said fund may be expended on county or township roads or bridges at the option of the county commissioners. All money in the state and county-aid road fund at the time this law is adopted shall remain in the county in which said money was collected and shall be credited to said county and state road fund."

It is to be noted that the "county and state road fund" is to be used for the construction, reconstruction and maintenance of "state roads" in counties, while the twenty per cent money provided for may be spent on county or township "roads or bridges."

Chapter 255 of the Laws of 1927 covers the same subject matter as chapter 214 of the Laws of 1925. In many respects it is a reenactment of chapter 214. Section 7 of chapter 255 deals with the distribution to the counties of the money raised by the gasoline tax and automobile licenses. It contains this significant language:

"The fund thus created in the various counties shall be known as the county and state road fund, and shall be used for the construction, improvement, reconstruction and maintenance of roads and bridges comprising the state highway system except as hereinafter provided."

It is to be noted that this section for the first time provides for the use of the county and state road fund in the construction and reconstruction of bridges as well as roads on the state highway system.

If it be held that the legislature by the enactment of chapter 214

of the Laws of 1925 intended .that county bridge funds could not be used to build bridges on a part of the state highway system in the county, then we must conclude that no provision was made by the legislature for funds with which to build such bridges. It is manifest that there is no provision for using the county and state road fund for any such purpose.

The entire history of road-building legislation in the state does not warrant any such a presumption. It would mean the legislature intended to provide for a fine all-weather road through counties, but left the streams without bridges upon which the traveler might cross to continue his journey on the other side of the stream. When confronted with the question of what the legislature intended by its enactments, the conclusion that commends itself most forcibly to the court is that the money to build the bridges should come from the source from which it had come ever since roads and bridges had been constructed in the state, that is, a tax levy for that purpose on the property in the county. This conclusion is strengthened by the fact that when the act of 1927 was passed there was an apparent change in legislative policy, and the legislature did what it could have done in 1925 had it intended to do what the county argues it did do, that is, it provided for the construction of bridges as well as roads with the county and state road fund.

The federal statute providing for extending federal aid to states for purposes of road building is found in 7477 of U. S. Compiled Statutes of 1918. That section provides that in states where the constitution prohibits the state from engaging in internal improvements the amount to be appropriated—

"Shall be turned over to the highway department of the state or to the governor of said state to be expended under the provisions of this act and under the rules and regulations of the department of agriculture, when any number of counties in any such state shall appropriate or provide the proportion or share needed to be raised in order to entitle such state to its part of the appropriation apportioned under this act."

In 1925 Kansas was one of the states whose constitution prohibited it from engaging in internal improvements.

R. S. 68-405 was enacted by the legislature of 1917 and is still in force. That section gives county commissioners authority to enter into all contracts and agreements with the state highway commission as required by the federal-aid act. Norton county acted pursuant to this authority and bound the full faith and credit of the county to furnish the money needed to meet the federal aid.

We have seen that the only provision for raising money for the construction of bridges is contained in R. S. 68-1101. Manifestly the legislature would not have provided that counties could enter into contracts for the construction of bridges on a portion of a state highway and have failed to provide means for raising funds with which to carry out the contracts.

We have concluded, therefore, that the use of $7,869.35 of the bridge fund of Norton county in the construction of bridges was on a part of the state system of highways and was not an unlawful diversion of funds.

There is an item of interest on warrants stamped "not paid for want of funds" that is in dispute. These warrants were drawn against the "county and state road" fund for Norton county, and when presented the county claims that fund was overdrawn; hence the interest charge which it seeks to charge against the county and state road fund. From what has been said it will be seen that had the books of the county treasurer been properly kept there would have been money on hand in that fund with which to pay them. Hence, the items of interest are not proper charges against the county and state road fund for Norton county.

The final item in dispute concerns the balance that was on hand in the so-called twenty per cent fund when chapter 255 of the Laws of 1927 went into effect. It will be remembered that chapter 214 of the Laws of 1925 made it optional with county commissioners as to the use of the twenty per cent of the county and state road fund on county and township roads. Chapter 255 of the Laws of 1927 contained the following provision:

"That twenty per cent (20%) of said fund shall be expended on county and township roads and bridges, at the option of the county commissioners."

It will be seen that this enactment made it the duty of the county commissioners to expend twenty per cent of the county and state highway fund on county and township roads and bridges. Under this enactment it was the duty of the county commissioners to set this up as a separate fund. In the case of *State, ex rel., v. State Highway Comm.,* 132 Kan. 327, 296 Pac. 986, it was held that under the 1925 act the county commissioners had no authority to set the twenty per cent money up as a separate fund, but that items should only be charged to it as they were actually expended on county and township roads. Norton county argues that when the fund was set up under the 1927 act the county treasurer should carry into the fund, at the beginning of the operative period of that act, twenty

per cent of any balance that was in the county and state road fund of Norton county on that date. To this contention we cannot assent. Section 7 of the 1927 act provided for an entirely new system of apportioning the money raised by means of gasoline tax and automobile license fees. We have concluded that the operation of the proviso with reference to the twenty per cent of the county and state road fund can only extend to funds distributed to the counties under the act of 1927.

From what has been said, the order is that the writ of mandamus in the case of *State, ex rel. J. F. Bennett, v. The State Highway Commission,* No. 30,839, will be denied, and the writ in the case of *State of Kansas, ex rel. Roland Boynton, v. The Board of County Commissioners of Norton County,* No. 30,968, will issue directing Norton county to pay to the state highway commission $20,604.65.

HARVEY, J., dissents from the third paragraph of the syllabus and the corresponding portion of the opinion.

HUTCHISON, J., not sitting.

