No. 31,828.

THE STATE OF KANSAS, ex rel. MAX WYMAN, County Attorney, *Appellant,* v. O. O. WILLIAMS, County Clerk of Reno County, THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY and THE RENO COMMUNITY HIGH-SCHOOL DISTRICT, *Appellees.* (BUHLER RURAL HIGH-SCHOOL DISTRICT No. 10, *Appellant.*)

(32 P. 2d 481.)

Opinion filed May 5, 1934.

*F. Dumont Smith, Eustace Smith* and *C. E. Chalfant,* all of Hutchinson, for the appellants.

*C. E. Branine* and *H. R. Branine,* both of Hutchinson, for appellee The Reno Community High-school District; *Luther Burns, J. E. DuMars,* both of Topeka,

A. C. Malloy, R. C. Davis and *Warren H. White,* all of Hutchinson, for appellee The Chicago, Rock Island & Pacific Railway Company.

The opinion of the court was delivered by

SMITH, J.: This is a proceeding in mandamus to compel the county clerk of Reno county to place 5.48 miles of main-line right of way of the Chicago, Rock Island and Pacific Railway Company on the tax rolls of Buhler rural high-school district No. 10 for the years 1928-'29-'30 and '31 at twice its assessed valuation, as provided for under R. S. 79-1427, the escaped-assessment statute. Judgment was for defendant. Plaintiff appeals.

The facts will require a short examination of the history of the school district. Buhler rural high-school district No. 10 was organized in August, 1923. It will be referred to as the Buhler district. At the time it was organized it comprised only the territory included in Buhler township. This territory contained 5.48 miles of the main line of the Rock Island. A few days later territory included in Clay township was added to the district. This territory contained 2.50 miles of the main line of the Rock Island. It will be seen that had the proper apportionment been made the Buhler district would have had 7.98 miles of Rock Island track on its tax rolls.

In 1923 the tax department of the Rock Island wrote to the county clerk stating that according to the figures of the company there were within the Buhler district 2.50 miles of Rock Island right of way. The letter asked the county clerk to correct this if any mistake had been made. It is not the duty of the railway company to make this allocation, as we shall presently see, but nevertheless the clerk took the figures of the company and made the apportionment as advised, even though it provided that there should go upon the tax rolls of the Buhler district 2.50 miles of right of way instead of 7.98, as would have been correct. What happened evidently was that some person, by mistake, at the railway tax office allotted the right of way to the Buhler district that was in the newly added territory and left out what was in the original territory that made up the district. The mistake was not discovered for nine years. All property in Reno county not taxed for some certain high school is taxed for the benefit of the Reno community high school of Nickerson, Kan. On that account the railway company during all these years paid taxes on the 5.48 miles in question to the community district. On February 1, 1933, the state, on the relation of the county at-

torney of Reno county, filed this action. The county clerk made his return to the writ, submitting himself to the judgment of the court. On February 11, 1933, the Rock Island on its own motion was made a party defendant and answered. On April 7, 1933, the railway company moved to have the Buhler district and the community district made parties defendant and set up the fact that it had paid the tax on the 5.48 miles of right of way omitted from the rolls of the Buhler district during the nine years to the community district by mistake; and that its property had not escaped taxation, because the tax had been paid to the community district; and that the Buhler district should be relegated to its remedy against the community high-school district.

The community district entered its appearance in this action on April 19, 1933, by filing a motion for additional time to plead. When it answered it alleged that the Buhler district was barred by the limitations contained in chapter 319 of the Laws of 1933, that chapter being the cash-basis law; that the remedy of the Buhler district was to have the error in the assessment and tax rolls corrected, as provided by R. S. 79-1701 and 79-1702, and that the time for making such corrections had expired; and that if the Buhler district had a cause of action it was for money had and received, and that practically all its claim was barred by the statute of limitations.

The Buhler district answered setting up the facts about as they have been detailed here, claiming that the railway company had made the false reports because the rate was lower in the community district than in the Buhler district. It also filed a cross petition against the community district, in which it asked that if it be adjudged that any of the tax due from the railway to the Buhler district had been paid by the railway to the community district, then the Buhler district should have judgment against the community district for the full amount thereof.

The facts were agreed on by the parties substantially as they have been detailed here, with the addition that the levies in the districts are admitted and show that for the first three years the rate of levy in the Buhler district was lower than that for the community district, and after that it was higher each year. From this it will be seen that at first the Rock Island lost money by being assessed in the wrong district, but that for the last six years it has saved. The trial

court denied the motion of the state for a peremptory writ against the county clerk and denied any relief to the Buhler district.

Shorn of all unnecessary verbiage, the situation as it now appears before this court is that for nine years the community district has been receiving money raised by taxing the 5.48 miles of right of way that should have gone to the Buhler district. The railway company has been paying taxes on the same 5.48 miles to a district that was not entitled to it. All the parties are before this court. The district that has been deprived of revenue to which it was entitled is looking to the railway company and to the district which received the money to make it whole. The entire transaction covers a period of nine years. The railway company can only be reached through the provisions of R. S. 79-1427. That statute under its own terms only goes back for a period of five years. Hence, a complete solution requires an examination of the affairs of the two districts for nine years.

Mandamus is the proper remedy to accomplish this. The dispute is between two agencies of sovereignty and is a matter of computation, once the legal questions are settled. The case of *State, ex rel., v. State Highway Comm.,* 132 Kan. 327, 295 Pac. 986, was a mandamus case. There the object of the suit was to adjust the accounts of the highway commission and McPherson county. This involved an examination of books and records and the determination of involved questions of fact. The question was raised as to whether mandamus was the proper remedy. This court held it was. It was there said:

"The use of mandamus to secure a speedy adjudication of questions of law for the guidance of state officers and official boards in the discharge of their duties is common in this state. (R. S. 60-1701, 60-1702.) Our conceptions of the proper use of mandamus to expedite the official business of the state have expanded far beyond the ancient limitations of matters justiciable in mandamus. (*State v. Dolley,* 82 Kan. 533, 108 Pac. 846; Id. 83 Kan. 80, 109 Pac. 992; *State, ex rel., v. Akers,* 92 Kan. 169, 172, 140 Pac. 637; *State, ex rel., v Howat,* 109 Kan. 376, 393, 198 Pac. 686; *State, ex rel., v. Bone,* 125 Kan. 818, 266 Pac. 85.)" (p. 334.)

What was there said about adjudicating questions of law between state officers and state boards is equally applicable to disputes between other agencies of the state when the remedy is invoked by the proper authority. This broadened use that the courts have made of the writ of mandamus has been of great value in making the

services of the courts available to the other branches of government in a speedy and efficient manner.

We will first discuss the question of whether the railway company can be made to pay the double assessment as prayed for.

The statute under which this remedy is invoked is R. S. 79-1427. Its provisions are as follows:

"That if the assessor shall discover that any personal property, which was subject to taxation in any year, has not been assessed, or for any cause any portion of any personal property has escaped taxation in any year or years, within five years next preceding, it shall be the duty of the assessor to list and value such property at twice its real value for each such year during which such property, or any portion thereof, was not taxed, and it shall be designated on his return as 'escaped assessment' for the preceding year or years, and he shall indicate in his return the year or years for which such escaped assessment or assessments is made. If the owner of such property shall be deceased, then the taxes charged as herein provided shall be assessed against the estate of such deceased person for three years only preceding his death, and shall be paid by the legal representative or representatives of such estate: *Provided,* That in the event that such escaped assessment is due to error of any assessor, or that any taxpayer was not afforded an opportunity to list his escaped property, then such escaped assessment shall be entered at its true value."

To fully understand the situation, we must examine the statutes providing for the taxation of railroads. The assessment of railroads is the duty of the state tax commission. (See R. S. 79-602 to 79-609.) R. S. 66-403 is a section of the general chapter with reference to railway companies. It provides as follows:

"Every railway corporation, before constructing any part of their road into or through any county named in their charter, shall make a map and profile of the route intended to be adopted by such company in such county, which shall be certified by the president and engineer of the company, or a majority of the directors, and filed in the office of the county clerk of the county into or through which the road is to be made."

R. S. 79-605 provides for the tax commission to make returns to the county clerk of each county in which any railroad property is located, and 79-606 provides, in part, as follows:

"Such returns shall be as follows:

"*First.* Number of miles of track located in each city and township in the county, and the total length in the county.

"*Second.* The average valuation per mile, such valuation to include the following items: Track, right of way, franchise, roadbed, rolling stock, telegraph lines and instruments connected therewith, material on hand, supplies and tools, and all other property used in the operation of the road, and all moneys and credits.

"*Third.* The average valuation per mile of all other personal property enumerated in this act.

"*Fourth.* The amount of valuation that shall be placed to the credit of each city and township in the county as heretofore provided for in this act."

In this case all statutes had been complied with up to the point where it became the duty of the county clerk to certify the valuation of the railroad property to be placed on the tax rolls of each district. That duty is enjoined upon the county clerk by R. S. 79-609. That section reads as follows:

"The county clerk, as soon as he shall have received the return of railroad assessment from the tax commission, shall certify to the proper officers of the different school districts, cities and townships in his county in or through which any portion of the railroad is located the amount of such assessment that is to be placed on the tax roll for the benefit of such school district, city or township; and he shall at the proper time place such assessment on the proper tax roll of such county, subject to the same per cent of levy for different purposes as in other property."

It will be noted that no duty is enjoined by statute on the railway company with reference to school districts. That is made the duty of the county clerk. However, in this case there is the circumstance that the tax department of the Rock Island wrote the county clerk a letter advising him that their records showed that there were 2.50 miles of right of way of that road in the Buhler district. The county clerk apparently took the statement without investigation. The assessment and tax rolls for each of the districts made up by the county clerk and certified to them showed the 5.48 miles in the community district rather than in the Buhler district where it belonged.

The position of the railway company is that the right of way in question has not "escaped assessment" under the provisions of the statute quoted, since the property was duly assessed as provided by law. The railway company points out that the statute provides "that if the assessor shall discover," etc., and argues that since railroad property is not assessed by the assessor, but by the state tax commission, the statute does not apply to railroads.

We have seen that while the 5.48 miles of railroad was assessed by the tax commission it was not assessed to the school district in question. The statute with reference to assessing railroads by the state tax commission is all a part of the general scheme of taxation covering all the property in the state, stocks of goods, farmers' property, and all. The plan providing that the property of railroads

should be assessed by a central authority for the entire state was adopted on account of the peculiar nature of railroad property. To arrive at the proper value for railroad property it is necessary that items of value be considered which might be out of the question for the county assessor to ascertain. Hence, the plan adopted. It was never the intention of the legislature to provide a different rule as to railroad property than was in effect for other property. The statutes with reference to taxation of railroads must all be construed together. When this is done it will be discovered that the county clerk, who is *ex officio* county assessor in Reno county, does have a duty to perform with reference to the taxation of railroads. He must apportion the value given it by the state tax commission to the different school districts on the basis of mileage. As far as school districts are concerned, the assessment of the railroad property is not complete until the county clerk has performed this duty. We hold, therefore, that the words "if the assessor shall discover" should be given a broad meaning and construed to refer to whatever function the assessor has to perform with reference to any particular form of property. When so construed there is no difficulty in holding that the language referred to in R. S. 79-1427 was intended to cover whatever duty the county clerk was compelled to perform with reference to railroad property; that is, the apportioning of it to the school districts. Once we have reached this conclusion, we have authorities upon which we may depend for guidance.

In 26 R. C. L. 351 we find the following rule:

"Taxes are not canceled and discharged by the failure of duty on the part of any tribunal or officer, legislative or administrative. Payment alone discharges the obligation, and until payment the state may proceed by all proper means to compel the performance of the obligation. No statutes of limitation run against the state, and it is a matter of discretion with it to determine how far into the past it will reach to compel performance of his obligation."

Analogous to the case under consideration is the case of *In re Moseley's Estate*, 100 Kan. 495, 164 Pac. 1073. In that case the prosecuting officers of the state had neglected to institute proceedings to collect certain inheritance taxes until after the law was repealed. The state argued that by this delay the state had lost the right to collect the taxes. The court said:

"In the absence of positive statutes clearly covering the subject, no inaction, procrastination or delay on the part of public officials is ever permitted to prejudice the rights of the state." (p. 497.)

·Many authorities are cited in that opinion. A school district is an agency of the state, and the same reasons why the state should not lose a right on account of the failure or omission of an officer apply to the case of a school district.

This phase of the case then may be considered on a discussion of the question of whether a taxpayer by the payment of his tax, levied by another taxing district outside of the territorial limits in which his property belongs and is properly taxed, can be relieved from payment within the proper taxing district.

In *Wilson v. Allen County,* 99 Kan. 586, 162 Pac. 1158, an analogous question was considered. There a landowner had paid his taxes in the wrong school district. The land had been placed on the tax rolls of the wrong school district by a mistake of the county clerk. The rate in the district where the tax was paid was higher than that in the proper district. The landowner sued the county for the difference. The court ordered the two districts to be made parties and awarded judgment against the county and in favor of the landowner in the amount of $81.33 and in favor of one district against the other in the amount of $48.75. The county appealed. This court held that the judgment against the county was wrong. It held first that the payments were voluntary and hence could not be recovered, citing *City of Atchison v. State, ex rel.,* 34 Kan. 379, 8 Pac. 367. This rule has been followed carefully by this court ever since. In the opinion in the Allen county case the court said:

"The payment was voluntary in each instance, notwithstanding it was made in the belief that the lands comprised a part of the school district in which they were assessed. It is incumbent on the landowner to know what school district his lands are a part of. The fact, as plaintiff alleges in his petition, that he was a resident of another county until 1913 furnishes no excuse for his failure to know. A different rule cannot be established for nonresidents from that which governs residents of the county." (p. 588.)

The reason that case is of interest to us is that it holds that a payment of taxes in the wrong district is a voluntary payment and that a voluntary payment cannot be recovered. Under the rule laid down in that case the Rock Island could not have recovered the taxes that it mistakenly paid to the community district, because they were not paid under protest. Hence, the payment of them in the wrong district cannot be relied on as a defense to an attempt to collect the taxes in the proper district. In *Snakenberg v. Stein,* 126 Ia. 650, the court considered this question. There a woman had

intrusted property to an agent in another township. For two years the property was assessed and the tax paid in that township. When the property was placed in the hands of an agent in Washington county, where it was assessed, it was attempted to hold the property for a double assessment in the town where the property owner lived. The court held that the assessment in Washington was void and that the property should be assessed in the town of the property owner's residence. The court said:

"The fact that the owner of personal property has intrusted it to an agent in another county, who in good faith returns it for taxation in that county, does not preclude the county of the owner's residence from assessing such property as omitted property and collecting back taxes thereon."

We hold that these authorities are in point here; that R. S. 79-1427 can reasonably be extended to the duty the county clerk has to perform with reference to railroad property; that is, the placing of it on the tax rolls of the school district; that the payment of taxes by the Rock Island in the wrong district was voluntary and, as far as this case is concerned, was no payment at all; and that hence the 5.48 miles of right of way was property that "has escaped taxation" under the provisions of R. S. 79-1427. The Buhler district argues that in accordance with the statute the property should be placed on the tax roll at twice its real value. To this we cannot agree. Attention is called to the concluding proviso of the section. It is as follows:

"*Provided,* That in the event that such escaped assessment is due to error of any assessor, or that any taxpayer was not afforded an opportunity to list his escaped property, then such escaped assessment shall be entered at its true value."

We have seen what the circumstances were under which the mistake was made in this case. This court holds that this is a case where the terms of the above proviso apply and that the property of the railroad in question should be placed on the tax rolls of the Buhler district at its real value.

It will be remembered that this mistake first occurred in 1923. Under the terms of R. S. 79-1427 the property can only be placed on the tax rolls of the Buhler district for five years back. Hence that leaves the question of the payments made to the community district by the Buhler district to be considered.

The first argument of the community district against the allowance of any claim of the Buhler district against it is that the claim is barred by the cash-basis law, being chapter 319 of the Laws of

1933. Under the terms of this act all school districts and municipalities made and published statements of debts and cash on hand as of April 1, 1933. This statement had to be published by May 1, 1933. The statute provided that anyone claiming to be a creditor of the municipality whose claim was not shown upon the notice must present the claim to the governing board of the municipality on or before May 15, 1933. The statute there provided for an appeal from the decision of the governing board to the district court if the claim should be disallowed. Under the terms of the statute the municipality was required to issue bonds to pay all of its outstanding indebtedness once it was determined. The statute took effect March 31, 1933.

The community district complied with the statute and did not publish in its statement any claim of the Buhler district against it. The Buhler district took no steps whatever under the statute. The community district argues that it was incumbent on the Buhler district to proceed under the cash-basis law, and since it did not do so it is barred.

The consideration of this question will necessitate an examination of the time when pleadings were filed in this case. The application for a writ was filed February 1, 1933. This was against the county clerk alone. On February 15 the Rock Island got permission to intervene and answered. This answer raised the question of the right of the county clerk to assess the railroad and pleaded that it had paid all taxes assessed. On April 7 the railway company asked that the two school districts be made parties. On April 9 such an order was made. On April 18, 1933, the Rock Island filed a supplement to its answer, setting up payments as has been detailed here. The prayer of this answer was as follows:

"Wherefore, this intervener prays that in event the court grants the prayer of the writ in this case, upon a finding that a portion of this intervener's mileage was allocated to community high-school district of Reno county by a mistake when the same should have been taxed in Buhler rural high-school district No. 10, then that the court enter judgment in this action against community high-school district of Reno county located at Nickerson, Kan., for the amount of taxes paid by mistake according to said finding, for the years above mentioned. Said judgment being in favor of Buhler rural high-school district No. 10, now a party to this action, or that the court enter judgment in favor of this intervener for said payments, for the benefit of rural high-school district No. 10, and that this intervener have such other and further relief, both legal and equitable, as may be necessary to protect its legal rights."

It will be noted that this pleading was filed after the taking effect of the cash-basis law and after the making of the order making the school districts parties. On April 19 the community district filed a motion for additional time to plead. On April 19 the Buhler district filed an answer to the alternative writ, admitting all facts pleaded in the writ. On the same date it filed an answer and cross petition to the pleading of the Rock Island heretofore mentioned. This pleading set up the payments about as detailed here. The pleading contained the following paragraph:

"This defendant, answering the pleading of the defendant Railway Company, says: That it has nothing to do with the taxes paid to the community high school of Nickerson; has no cause of action against said community high school and declines to engage in any controversy with said high-school district. That if the defendant railway company has paid a tax to the community high school of Nickerson, Kan., by mistake and can lawfully collect said taxes from the said district it should be required to do so at its own costs and expense; and that the said supplemental pleading constitutes no defense whatever to the alternative writ of mandamus herein or to the claim of this answering district."

On May 1, 1933, the Buhler district filed an amended answer and cross petition against the community district in which it pleaded the payments as heretofore set out. The prayer was as follows:

"Wherefore, this defendant prays that if the court shall find and determine that any of the tax due from the said railway company to this defendant has been paid by the defendant railway company to the said community high-school district of Nickerson, Kan., in any of the said nine years as above alleged that in such event this defendant shall have judgment against the said community high-school district of Nickerson, Kan., for the full amount thereof; that this defendant recover its costs herein expended, and for such other and further relief as may to the court seem proper."

On May 18 the community district filed a motion against the amended answer and cross petition of the Buhler district. On May 26 the Buhler district filed an amended answer and cross petition in which it set out the details of the payments. On June 24 the community district filed its answer to the amended cross petition of the Buhler district. This pleading set up the defense of the cash-basis law; that the remedy of the Buhler district was under R. S. 79-1701 and 79-1702, and that the time had passed for that; that the claim was barred by the general statute of limitations; that the Buhler district had waived its rights to sue the community district by its answer to the Rock Island; and that the money received had been expended in the conduct of its school and that the community

district received no money for the use and benefit of the Buhler district. The answer prayed judgment for costs. The community district on June 14 filed a general denial to the supplement to the separate answer and cross petition of the Rock Island. On June 14, on motion of the Buhler district, the court ordered stricken from the answer and cross petition of the Buhler district the following language:

"That it has nothing to do with the taxes paid to the community high school of Nickerson; has no cause of action against said community high school and declines to engage in any controversy with said high-school district."

The dates of the filing of all the pleadings have been set out here in detail because it is important to determine just what shape the litigation was in when the cash-basis law took effect. The question is, Did the filing of the pleadings in this case and the issues made up satisfy the requirement of the cash-basis law that a creditor must file a claim before May 15? R. S. 1933 Supp. 9-130 requires the claim of a creditor of a failed bank to file his claim against the receiver within one year of the failure of the bank. In *National Bank of Topeka v. Johnson,* 136 Kan. 377, 15 P. 2d 436, a creditor filed no claim, but filed suit and secured a judgment within a year. In proceedings in aid of execution the point was raised that no notice of the claim had been filed. The court held against this contention and said:

"The whole purpose of the statute is accomplished when the receiver has notice in some substantial and formal manner of such a claim and an opportunity to act upon it. When a receiver is made defendant in a civil action where a money judgment is sought against him as receiver and he is personally served with summons in the action, he has sufficient notice of there being a claim to resist it, or give it consideration among the other claims filed formally under the statute, and especially is this true when, before the expiration of the year, he is formally served with a certified copy of the journal entry of judgment rendered against him as receiver upon default." (p. 379.)

The court drew an analogy between this case and the nonclaim statute concerning decedents' estates (R. S. 1933 Supp. 22-702), where it is held that an action commenced will take the place of filing a claim or making a demand.

The community district seeks to avoid the effect of this rule by arguing that the action is mandamus, and the only proper pleadings in such an action are the alternative writ and the return. The answer to that is that the use of mandamus has been greatly broadened in recent years. (See *State, ex rel., v. State Highway*

*Comm.,* supra.) There can be no doubt that the community district had notice that there was a claim against it when the Rock Island asked for and secured an order that both districts should be made defendants. That was on the 8th of April. Notice of this order was served on the community district on April 12. That district entered its appearance in the action when it asked for time to plead. (See *Meixell v. Kirkpatrick,* 29 Kan. 679; *Wood v. Cobe,* 80 Kan. 496, 103 Pac. 101; also, *Westerman v. Westerman,* 121 Kan. 501, 247 Pac. 863.) When the district entered this general appearance it waived all objections to the jurisdiction of the court. On April 18 the Rock Island filed the supplement to its answer in which it asked for judgment against the community district. This was certainly notice to the district of a claim long before the bar fixed by the cash-basis law took effect. Finally on May 15 the Buhler district filed an amended cross petition in which it asked for the relief for which it is contending here. Under all these circumstances, and considering the issues made by the pleadings on May 15, 1933, when the time expired for the filing of claims under the cash-basis law, the claim against the community district was in process of adjudication. Since this is true, then under the authority of *Bank v. Johnson,* supra, it was not necessary for the Buhler district to file any claim.

Counsel for the community district make the point that under the cash-basis law the district had an opportunity to issue bonds to cover its indebtedness. In that connection it may be said in passing that we see no reason why bonds of the school district may not be issued to pay this indebtedness.

We shall next discuss the argument of the community district that the error should have been corrected under R. S. 79-1701 and 79-1702 and that the time for proceeding under these sections had expired, and the argument that if the Buhler district had any cause of action against the community district it was for money had and received and is barred by the general statute of limitations. We are not without authorities to guide us here. R. S. 79-1701 is as follows:

"The county clerk at any time previous to November 1 may correct any clerical errors in the assessment and tax rolls for the current year . . . and errors whereby the assessment of either real or personal property has been assigned to a district in which the property did not have its taxable situs, in which case the correction shall be made by transferring the assessment of the property from the wrong district to the proper district. After the rolls

have been delivered to the county treasurer on the 1st of November no errors of the kind herein mentioned shall be corrected except upon the order of the board of county commissioners whose authority to order such corrections shall expire on the first day of February of the year following the year in which the property was assessed. If all grievances are not remedied as hereinbefore provided, previous to February 1, the tax commission is empowered at any time before June 20 of the year following the assessment year, pursuant to an application duly filed, to authorize the correction of all such errors, if it shall be made to appear that the taxpayer has been unjustly and unlawfully charged with taxes. The authority given in this section to correct errors shall carry with it the authority to issue or direct the issuance of orders to refund taxes which shall have been shown to have been unlawfully charged and collected, and authority to cancel all such unpaid erroneous taxes. Valuations placed on property by the assessor or by the county board of equalization shall not be considered under this section as erroneous assessments."

In *School District No. 8 v. Board of Education*, 115 Kan. 806, 224 Pac. 892, this question was passed upon. In that case the property of the Armour Grain Company was located in the taxing district of school district No. 8. In the years 1918 and 1919 the county assessor erroneously returned the property as in the territory of the board of education. The result was the assessed value of the property in the board of education territory was increased while that of the school district was diminished. The levies were extended and taxes collected on that basis. Suit to collect the taxes paid by the grain company to the board of education was commenced four years after the first erroneous assessment. One of the defenses argued by the board of education in that case was that the erroneous assessment might have been corrected by the county clerk under R. S. 79-1701. That section was as heretofore set out in this opinion. In dealing with that question this court said:

"Each district as a public functionary has a right to receive taxes from the taxable property in its territory. In this respect districts stand toward each other very much as private proprietors, each of whom is entitled to revenue from his own domain. If a common overseer make a mistake and place in the treasury of one, revenue produced by the property of the other, the estate of the one is benefited at the expense of the other, and the misplaced money is money had and received by one for the use and benefit of the other." (p. 810.)

The board of education also raised the defense of the statute of limitations on that question. This court said:

"This being true, a common-law action lies for money had and received, whatever provision the legislature has made to correct mistakes of ministerial

officers having to do with assessment and collection of taxes. Such an action would ordinarily be governed by the code provision relating to limitation of actions, but because the school district is an agency of sovereignty, those provisions do not apply to it." (p. 810.)

To the same effect is the decision in *School Dist. No. 6 v. School Dist. No 5*, 255 Mich. 428, 238 N. W. 214. That was a case where the plaintiff's and defendant's districts were in the same township. The supervisor assessed for school taxes in defendant's district certain bank stock which was properly assessable in plaintiff's district. The tax was voluntarily paid and remitted by the township treasurer to the defendant district. Plaintiff sued in assumpsit to recover the tax from defendant. The court held:

"Because the tax was voluntarily paid, questions of the validity of the assessment and the right of taxpayer to attack it had no bearing on the issue. The money is a public fund, legally unassailable by the taxpayer belonging to one district or the other. Had the law been observed, plaintiff would have collected the tax. Through breach of law, plaintiff and its taxpayers have been deprived of their just due, and defendant has money which in equity and good conscience belongs to the plaintiff."

The Michigan court quoted approvingly from the case of *Town of Balkan v. Village of Buhl*, 158 Minn. 271, 197 N. W. 266, in which the court said:

"We hold, therefore, that plaintiff has a clear right to the money in question. It is clearly money which in equity and good conscience belongs to plaintiff and not to defendant. Its retention would enable defendant wrongfully to enrich himself at the expense of plaintiff—to lower the tax burden of its inhabitants at the expense of those of Balkan. Surely, courts cannot blind themselves to the obvious equities of such a situation and deny a right so clear as that of plaintiff in favor of a party so much in the wrong as defendant." (p. 279.)

As to the question of whether the general statute of limitations applies the court has recently passed on the question. In *Nemaha County Comm'rs v. City of Seneca*, 138 Kan. 895, 28 P. 2d 1034, the court considered a suit brought by a county to recover its *pro rata* share of taxes that had been paid under protest and distributed to the city regardless of the protest. On the question of the statute of limitations this court said:

"Touching the bar of the statute of limitations, and conceding that this action is otherwise maintainable, it is fundamental that in its capacity as a governmental agency the statute of limitations does not run against the county except where some specific statute so declares. (*Osawatomie v. Miami County*, 78 Kan. 270, 96 Pac. 670, and citations.) It seems a reasonable corollary to that rule to hold that where one governmental agency (a city) has received

public funds paid to it by mistake by another governmental agency (a county) the statute of limitations has no application; consequently the trial court's ruling on this point was correct." (p. 898.)

To the same effect is the holding in *Greenwood County Comm'rs v. School District*, ante, p. 297, 31 P. 2d 723.

We conclude, therefore, that the judgment of the trial court should be reversed.

A peremptory writ of mandamus should issue to the board of Reno community high-school district directing it to pay to the board of Buhler rural high-school No. 10 all the taxes that have been paid by the Chicago, Rock Island and Pacific Railway Company on the 5.48 miles of right of way in question for the years 1923 to 1932 and that a writ issue against the Chicago, Rock Island and Pacific Railway Company to pay the difference between what is paid by the community district and what the regular levy of the district would have raised for the years from 1928 to 1932. It is so ordered.